1    ROBERT C. SCHUBERT (S.B.N. 62684)
     rschubert@sjk.law
2    WILLEM F. JONCKHEER (S.B.N. 178748)
     wjonckheer@sjk.law
3    NOAH M. SCHUBERT (S.B.N. 278696)
     nschubert@sjk.law
4    CASSIDY KIM (S.B.N. 315236)
     ckim@sjk.law
5    **SCHUBERT JONCKHEER & KOLBE LLP**
     Three Embarcadero Center, Suite 1650
6    San Francisco, CA 94111
     Telephone: (415) 788-4220
7    Facsimile: (415) 788-0161
8

9    *Attorneys for Plaintiff Montgomery Beyer*

10

11          UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13          SAN FRANCISCO DIVISION

14

15 | MONTGOMERY BEYER, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-02006-EMC |

**PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT**

Plaintiff,

v.

SYMANTEC CORPORATION,

Defendant.

Date: July 12, 2018
Time: 1:30 p.m.
Dept:   Courtroom 5
Judge:  Hon. Edward M. Chen

Filed: Apr. 2, 2018
Trial: None Set

1

2

## TABLE OF CONTENTS

3

INTRODUCTION ........................................................................................................... 1

4

SUMMARY OF FACTS ................................................................................................. 3

5

   I.    SYMANTEC TOUTED ITS PRODUCTS AS INDUSTRY-LEADING  SECURITY

SOLUTIONS. ............................................................................................................. 3

6

7

   II.   SYMANTEC FAILED TO DESIGN THE ANTIVIRUS DECOMPOSER ENGINE TO

COMPLY WITH THE PRINCIPLE OF LEAST PRIVILEGES. ................................................. 6

8

   III.    SYMANTEC PERPETUALLY FAILED TO PATCH THIRD-PARTY  OPEN

SOURCE CODE. ......................................................................................................... 7

9

   IV.    PLAINTIFF RELIED ON SYMANTEC'S MISREPRESENTATIONS AND

10

OMISSIONS. ............................................................................................................. 8

11

ARGUMENT ................................................................................................................ 9

12

   I.    THE UCL "FRAUDULENT" PRONG, CLRA, AND FAL CLAIMS ARE

ADEQUATELY STATED. .............................................................................................. 9

13

      A.    Plaintiff's Allegations Are Sufficiently Particularized to State a Claim. .................. 9

14

      B.    Plaintiff Has Alleged Actionable Misrepresentations. ........................................ 11

15

      C.    Plaintiff Has Adequately Alleged Actual Reliance on Symantec's

16

Misrepresentations. ................................................................................................. 13

17

      D.    Symantec Had a Duty to Disclose the High Privilege Defect and the Outdated

Source Code Defect. ................................................................................................ 14

18

   II.   PLAINTIFF'S REMAINING CLAIMS ARE ADEQUATELY STATED. ...................... 16

19

      A.    The UCL "Unlawful" and "Unfair" Prongs Are Adequately Stated. ..................... 17

20

      B.    The Song-Beverly Act Claim Is Adequately Stated. ............................................. 19

21

      C.    The Claim for Quasi-Contract / Unjust Enrichment Is Adequately Stated. ............ 21

22

   III.    PLAINTIFF HAS ARTICLE III AND STATUTORY STANDING AS TO THE

23

ENTERPRISE PRODUCTS. ........................................................................................... 22

24

      A.    Plaintiff Has Standing to Bring Claims for Enterprise Products  He Did Not

Purchase. ................................................................................................................. 22

25

      B.    Symantec's Motion to Strike Is Improper and Should Be Denied. ......................... 24

26

CONCLUSION ............................................................................................................ 25

27

28

PLAINTIFF'S  OPPOSITION  TO   DEFENDANT SYMANTEC  CORPORATION'S  MOTION  TO  DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

1

2

## TABLE OF AUTHORITIES

3

**Cases**

4

*Ambers v. BevMo, Inc.*, 236 Cal. App. 4th 508 (2015) ............................................... 19

5

*Ang v. Bimbo Bakers USA, Inc.*, U.S. Dist. LEXIS 34443 (N.D. Cal. Mar. 13, 2014) .................. 23

6

*Annunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133 (C.D. Cal. 2005) ....................... 11

7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................... 16

8

*Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015) ................................ 21

9

*Astiana v. Dreyer's Grand Ice Cream, Inc*, 2012 U.S. Dist. LEXIS 10137 (N.D. Cal. Jul. 20, 2012) ......................................................................................... 23, 24

10

*Baggett v. Hewelett-Packard Co.*, 582 F. Supp. 2d 1261 (C.D. Cal. 2007) .................................. 10

11

*Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255 (2006) ................................ 15

12

*Cal. State Elecs. Ass'n v. Zeos Int'l Ltd.*, 41 Cal. App. 4th 1270 (1996) ................................ 19, 20

13

*Clancy v. Bromley Tea Co.*, 2013 U.S. Dist. LEXIS 112722 (N.D. Cal. Aug. 9, 2013) ................ 24

14

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) .................. 11

15

*Cook Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 (9th Cir. 1990) ........ 11

16

*Corson v. Toyota Motor Sales*, 2013 US. Dist. LEXIS 189262 (C.D. Cal. July 18, 2013) .. 9, 10, 11

17

*Darling v. Green*, 2013 U.S. Dist. LEXIS 190615 (C.D. Cal. Sep. 25, 2013) ......................... 19, 20

18

*Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824 (2006) ...................................... 15

19

*Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350 (2010) ........................................ 21

20

*Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007) ................................... 10, 16

21

*Grace v. Apple*, 2017 U.S. Dist. LEXIS 119109 (N.D. Cal. Jul. 28, 2017) ................. 17, 19, 23, 24

22

*Haskins v. Symantec Corp.*, 2013 U.S. Dist. LEXIS 169865 (N.D. Cal. Dec. 2, 2013) .......... 12, 18

23

*Haskins v. Symantec*, 2014 U.S. Dist. LEXIS 75348 (N.D. Cal. June 2, 2014) ........................... 11

24

*Heliotis v. Schuman*, 181 Cal. App. 3d 646 (1986) ...................................................... 14

25

*Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957 (C.D. Cal. Oct. 3, 2014) ... 13, 14

26

*In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D. Cal. Feb. 14, 2016) .......... 17, 19

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

*In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051 (N.D. Cal. Jan. 21, 2015) ................................................................................................................................. passim

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) ..................................................... 17

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ....................................................................... 9, 14

*Kowalsky v. Hewelett-Packard Co.*, 771 F. Supp. 2d 1156 (N.D. Cal. 2011) ............................... 9

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997) ............................................................... 14, 16

*Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297 (2009) .................................................... 20, 21

*Morgan v. Wallaby Yogurt Co.*, 2014 U.S. Dist. LEXIS 34548 (N.D. Cal. Mar. 13, 2014) ....... 9, 23

*Norcia v. Samsung Telecoms. Am., LLC*, 2015 U.S. Dist. LEXIS 110454 (N.D. Cal. Aug. 20, 2015) ........................................................................................................................... 15, 16

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) .............................. 11

*Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659 (2006) .................................................. 17

*Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048 (N.D. Cal. 2004) ............................ 24

*Rasmussen v. Apple*, 27 F. Supp. 3d 1027 (N.D. Cal. Mar. 14, 2014) .................... 9, 10, 11, 12, 15

*Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015) ............................................. 15

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) ............................................................ 9, 10

*Swearingen v. Healthy Bev., LLC*, 2017 U.S. Dist. LEXIS 66938 (N.D. Cal. May 2, 2017) .... 21, 22

*U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033 (C.D. Cal. 2012) ............................... 24

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) .............................................. 9, 10

*Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970 (9th Cir. 2010) .......................................... 24

*Williams v. Gerber Prods.*, 523 F.3d 934 (9th Cir. 2008) .......................................................... 16

**Statutes**

Com. Code § 2401 ....................................................................................................................... 19

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 16

Fed. R. Civ. P. 12(f) ................................................................................................................... 24

Fed. R. Civ. P. 9(b) ................................................................................................................. 9, 10

-iii-

**INTRODUCTION**

This is a consumer class action brought on behalf of purchasers of certain network security software products sold or licensed by Defendant Symantec Corporation ("Symantec"). These allegations arise out of revelations about critical security flaws in the Affected Products, as revealed by Project Zero, Google's team of expert cybersecurity analysts dedicated to identifying and resolving "zero-day" vulnerabilities, or flaws in software that can be exploited by hackers. Plaintiff alleges that between December 21, 2005 and September 19, 2016, Symantec's Norton brand consumer products ("Norton Products") and Symantec brand business products ("Enterprise Products," and together with the Norton Products, the "Affected Products") contained critical defects in the AntiVirus Decomposer Engine, the core engine common to all the Affected Products that decompresses executable files so that they can then be scanned for malicious code. Specifically, the AntiVirus Decomposer Engine contained old third-party source code for which there were publicly known security exploits.  Symantec had failed to patch the third-party source code over a several-year period, contrary to cybersecurity best practice which requires timely implementation of security updates to software. In addition, Symantec violated the basic principle of least privilege, another fundamental cybersecurity best practice, by unnecessarily assigning the highest operating system privilege levels to the AntiVirus Decomposer Engine and thus failing to design it to limit the impact of a vulnerability on a computer's operating system. Instead, the core engine unpacked and examined compressed executable files in the most sensitive part of a computer's operating system, thereby exposing millions of computer systems to subversion and the risk of "a clean overflow as root" or "kernel memory corruption," leading to "total system shutdown," "total information disclosure," and "total compromise of system integrity" (cleaned up). As Project Zero aptly described, these defects "[were] as bad as it gets." It was not until 2017 that Symantec updated its product line to comply with the principle of least privilege by including a sandbox that directs the core engine to run and analyze unknown files in an isolated, protected environment.

PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

In the Complaint, Plaintiff alleges claims against Symantec under the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"), Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.* ("Song-Beverly Act"), False Advertising Act, Cal. Bus. & Prof. Code § 17500 *et seq.* ("FAL"), and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"). Plaintiff also alleges a Quasi-Contract / Unjust Enrichment claim against Symantec. By the instant motion, Symantec moves under Rule 9(b) to dismiss Plaintiff's claims under the UCL's "fraudulent" prong, the CLRA, and the FAL. Symantec also moves under Rule 12(b)(6) to dismiss Plaintiff's remaining claims arising under the UCL's "unlawful" and "unfair" prongs, the Song-Beverly Act, and Quasi Contract / Unjust Enrichment. Lastly, Symantec moves to dismiss Plaintiff's claims as they relate to the Enterprise Products for lack of Article III and statutory standing. As demonstrated below— and contrary to Symantec's motion—Plaintiff has the requisite standing to pursue each claim and has adequately stated all alleged claims.

Symantec also moves under Rule 12(f) to strike all of Plaintiff's allegations as to the Enterprise Products. Without support, Symantec argues that the Enterprise Products are immaterial and impertinent to the claims at issue in Plaintiff's complaint. Symantec wholly ignores, let alone disputes, Plaintiff's allegations that the defective AntiVirus Decomposer Engine was common to and supported Symantec's entire product line, including the consumer and enterprise security products. *See* Plaintiff's Complaint (ECF No. 1), ¶ 17.[1] Similar to the Norton Products representations, Symantec's Enterprise Products were marketed as providing unrivaled security features, including analysis tools that "separate[] files at risk from those that are safe, for faster and more accurate malware detection." ¶ 19. These paragraphs are neither immaterial nor impertinent to Plaintiff's claims, all of which arise under the same defective core engine, a defect that Symantec has admitted. ¶ 4. Motions to strike are also disfavored, and Symantec cites no analogous case where such relief was granted. Plaintiff's claims as to the Enterprise Products are proper.

---

[1] All ¶ references herein are to the Complaint, unless otherwise stated.

## SUMMARY OF FACTS

Symantec is a global provider of network security solutions for consumer and home businesses (served under the Norton brand), as well as for mid-size and large organizations (served under the Symantec brand). Symantec's Norton Products and Enterprise Products are uniformly supported by the same AntiVirus Decomposer Engine, which serves as the backbone of Symantec's entire product line. ¶ 17.

## I.   SYMANTEC TOUTED ITS PRODUCTS AS INDUSTRY-LEADING SECURITY SOLUTIONS.

On its website, Symantec marketed its Norton Products as the best cybersecurity solutions available on the market, providing consumers with industry-leading, enhanced protections against the latest online threats to their computers. Examples of Symantec's representations include:

**Norton 360 v. 4.0 Premier Edition (2010)**

Features

. . .

NEW! Provides unprecedented and unmatched threat detection — <u>Adds an additional layer of protection to detect viruses</u>, Trojans, spyware, and other threats. Norton™ reputation service technology scrutinizes different attributes of files and applications in real-time to determine if they are safe.

NEW! Warns you of dangerous downloads — <u>Proactively protects you by analyzing newly downloaded files and applications for threats before you install or run them on your PC</u>.

. . .

Protects your PC, online activities and your identity – <u>Delivers industry-leading, all-in-one protection against identity theft, online fraud, phishing, viruses, Trojans, bots, rootkits,[2] spyware, and the latest cyber-threats</u>.

¶ 18 (emphasis supplied).

---

[2] Rootkit refers to a set of clandestine software tools designed to provide continued privileged access to a computer system. *See* Neil DuPaul, *Rootkit: What is a Rootkit?*, CA VERACODE (Jan. 26, 2018), https://www.veracode.com/security/rootkit.

PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

**Norton AntiVirus (2011)**

. . .

Protects your PC against the latest viruses, spyware, and other threats.

Delivers fast, powerful online protection to keep you a step ahead of cyber attacks.

. . .

Features

<u>Protects your PC against the latest known viruses, spyware, and other threats</u>

Norton Reputation Service instantly checks where files came from and how long they've been around to identify and stop new crimeware faster than other, less sophisticated security software.

Norton Protection System uses several overlapping layers of protection that work together to stop viruses, spyware and other online attacks.

Norton Pulse Updates provides up-to-the-minute updates that protect against the latest threats without slowing down your computer.

SONAR 3 Behavioral Protection monitors your PC for suspicious behavior to quickly detect new online threats.

Norton Bootable Recovery Tool creates an emergency CD/DVD/USB that gets you back up and running even if your PC has become so infected that it won't start up.

Bot detection blocks the automated programs cybercriminals use to take control of your PC, access your private information, and use your computer to send out spam and launch attacks on other PCs.

Worm protection safeguards your PC against fast-spreading Internet worms and prevents you from accidentally passing them on to others.

<u>Rootkit detection finds and removes deeply buried crimeware that can hide other types of threats and allow cybercriminals to take control of your PC</u>.

¶ 18 (emphasis supplied).

**Norton 360 v. 5.0 Premier Edition (2012)**

Key Features

. . .

Email, chat, and download files without worry

PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

<u>Detects and eliminates viruses, spyware, and other threats before they can do damage</u>.

Warns you if a downloaded file is dangerous before you install it on your PC.

Prevents crimeware from being secretly downloaded to your computer.

Blocks annoying and potentially dangerous spam.

¶ 18 (emphasis supplied).

In addition, Symantec marketed its Enterprise Products as providing "unrivaled security against known, and unknown, threats," such as through Symantec Insight, a proprietary tool that "separate[s] files at risk from those that are safe, for faster and more accurate malware detection." ¶ 19.

**Symantec Endpoint Protection (2014)**

Unrivaled Security

Today's complicated threat landscape requires sophisticated protection from large-scale malware to the most targeted attacks. <u>Only Symantec uses Insight</u>, with the collective wisdom of 200+ million systems in over 200 countries to identify and create a security rating for every file accessed through the internet. <u>This superior reputation technology is combined with network, behavior, file and repair layers of defense to provide unrivaled security against known, and unknown, threats</u>.

¶ 19 (emphasis supplied).

**Symantec Protection Suite Enterprise Edition (2014)**

New Features

. . .

Fastest, Most-effective Endpoint Security:

<u>Symantec Insight - Separates files at risk from those that are safe, for faster and more accurate malware detection</u>.

Real Time SONAR 3 - Examines programs as they run, identifying and stopping malicious behavior even of new and previously unknown threats.

. . .

Key Features

> Fastest, most-effective protection, powered by Symantec Insight, for laptops, desktops, servers, messaging and web gateways--protection beyond antivirus.
>
> Catch more than 99% of spam and prevent data loss with advanced content filtering to identify and control the flow of sensitive data in email and IM.
>
> Web gateway security that protects against web threats, including malicious software, spyware, botnets, viruses, and malware.
>
> Rapid data and system recovery recovers individual files and folders in seconds or complete Windows systems in minutes to dissimilar hardware or virtual environments.

¶ 19 (emphasis supplied).

## II.   SYMANTEC FAILED TO DESIGN THE ANTIVIRUS DECOMPOSER ENGINE TO COMPLY WITH THE PRINCIPLE OF LEAST PRIVILEGES.

On or about April 18, 2016, Google's Project Zero team notified Symantec of critical defects in the AntiVirus Decomposer Engine, a key component of Symantec's Norton and Enterprise Products that unpacks compressed executable files so that they can then be scanned for malicious code. ¶ 2. On June 28, 2016, after months of working with Symantec to verify and resolve the reported issues, Project Zero publicly disclosed that Symantec had utilized a dangerous software design for the AntiVirus Decomposer Engine. ¶¶ 4, 25. Symantec released a related security advisory on the same day, acknowledging the defect and detailing the relevant patches to its customers. *Id.* Given the sheer number of products that required patching, Symantec had to release the updates in phases over a several-month period. ¶ 4. During this time, and throughout the Class Period, millions of consumers and businesses remained unaware that their antivirus software had utterly failed to perform as expected, and instead, had exposed their systems to remote attacks and other easily exploitable security vulnerabilities. ¶ 5.

In particular, Project Zero discovered that Symantec had unnecessarily assigned the highest privilege levels to the file scanning and analysis function of the AntiVirus Decomposer Engine ("High Privilege Defect"). *Id.* The High Privilege Defect contravened a key cybersecurity best practice—the principle of least privilege—which states that software should operate using the least amount of privilege necessary to complete the task. ¶ 26. Indeed, Symantec itself had long

advised consumers and businesses of the importance of running systems "under the principle of least privilege where possible to limit the impact of exploit by threats." ¶ 35 (detailing similar security advisories going back to 2007). Symantec further failed to implement industry-standard measures, such as sandboxing, to make sure that potential malware and other untrusted files were processed in a secure environment. ¶ 27. This was a critical shortcoming, especially given the "strong evidence that an active black market trade in antivirus exploits exists." ¶ 34. The High Privilege Defect rendered the Affected Products a serious threat vector for a wide variety of cyberattacks, including vulnerabilities that required very little knowledge or skill to exploit. ¶ 28.

### III.     SYMANTEC PERPETUALLY FAILED TO PATCH THIRD-PARTY OPEN SOURCE CODE.

Project Zero further disclosed that the AntiVirus Decomposer Engine was designed with third-party source code, including libmspack and unrarsrc libraries. ¶ 29. Source code is the underlying software code that programmers write and manipulate to effect specific program or application functions. ¶ 23 n. 3. Open source code is source code that is made available for others to view, copy, modify, and otherwise analyze. *Id.* Project Zero noted that the third-party open source libraries that Symantec relied on had been updated several times over the years to resolve "hundreds of critical memory corruption bugs." ¶ 29. However, Symantec had failed to implement the source code updates for at least seven years, meaning that the Affected Products were exposed to dozens of public vulnerabilities and exploits, despite patches being readily available ("Outdated Source Code Defect"). *Id.* Symantec's "astonishing [failure to] track new releases of third party code" was a fundamental violation of yet another security best practice, i.e., patching, which is routinely emphasized by experts as critical to staying safe online. ¶ 30. As with the High Privilege Defect, Symantec was well aware of the importance of "[k]eep[ing] all operating systems and applications updated with the latest vendor patches." ¶ 35. Symantec's protracted failure to patch resulted in further critical vulnerabilities that exposed millions of computer systems to the risk of total information disclosure and total compromise of system integrity. ¶ 30.

**IV.     PLAINTIFF RELIED ON SYMANTEC'S MISREPRESENTATIONS AND OMISSIONS.**

In making his purchases, Plaintiff relied on the statements that Symantec made about the industry-leading capabilities and security features of the Norton Products. Based on those statements, Plaintiff believed that the Norton Products would provide "enhanced protection" of his computer systems from the "latest online threats" and "a broad range of online threats," including rootkit. ¶¶ 20-23. Contrary to Symantec's attempt to recast the Complaint, Plaintiff does not allege that the Norton Products would be invulnerable. Rather, Plaintiff reasonably believed that at the very least, the Norton Products were fundamentally designed to function in the ways they were represented. To this end, Plaintiff believed, for example, that the Norton Products were designed to track updates in known corruption bugs and public exploits so that his computer systems would be protected against the latest online threats. ¶¶ 20-22, 24. Plaintiff further believed that the products he purchased were designed to protect against illegitimate administrator access to his computer systems. *Id.* Given Symantec's representations, Plaintiff did not know that the Norton Products suffered from a defective AntiVirus Decomposer Engine that ran on outdated third-party source code, with publicly available exploits, and failed to operate under the principle of least privileges when scanning unknown and potentially malicious files. ¶ 24. Plaintiff had no reason to suspect that the Norton Products were not at all designed to successfully carry out the functions represented.

In the Complaint, Plaintiff included links to archived web pages containing the representations he relied upon prior to each purchase.[3] In the instant motion, Symantec argues that the links are expired and requests judicial notice of web pages that are essentially blank and do not contain any representations by Symantec. By contrast, Plaintiff properly provided notice in the Complaint of the years of purchase, product names of his purchases (including specific version numbers), and the company websites he visited to research the products prior to purchase. ¶¶ 20-

---

[3] While Plaintiff provided details of all his Symantec purchases in the Complaint to provide context, Plaintiff is not seeking recovery for the First Purchase, which came pre-installed on a Dell computer, or his Fourth and Fifth Purchases, which were refunded in full.

23. Plaintiff has further provided the referenced representations as an exhibit to the Declaration of Willem F. Jonckheer in Support of Plaintiff's Opposition to Defendant Symantec Corporation's Motion to Dismiss Complaint.

## ARGUMENT

### I.    THE UCL "FRAUDULENT" PRONG, CLRA, AND FAL CLAIMS ARE ADEQUATELY STATED.

#### A.    Plaintiff's Allegations Are Sufficiently Particularized to State a Claim.

Pursuant to Rule 9(b), fraud-based claims must be pleaded with particularity, meaning that claims grounded in fraud must "be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The particularity required in pleading fraud is not intended to be mechanically applied; rather the facts alleged must merely be "enough to give a defendant notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citations omitted). *See also Rasmussen v. Apple*, 27 F. Supp. 3d 1027, 1044 (N.D. Cal. Mar. 14, 2014) (finding that "[w]hile Plaintiff has not expressly alleged the *precise* statements or advertisements upon which he has relied, he has alleged sufficient information . . . [including] examples of similar specific statements from the same sources, to give [Defendant] notice of the nature of the alleged misrepresentations at issue"). Further, the "standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA." *Morgan v. Wallaby Yogurt Co.*, 2014 U.S. Dist. LEXIS 34548, at *41 (N.D. Cal. Mar. 13, 2014) (citing *Kowalsky v. Hewelett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 (N.D. Cal. 2011)). Similarly, the "Supreme Court of California has held [that] a violation of the UCL's fraud prong is also a violation of the false advertising law." *Id.* at *42 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 n. 8 (2009)).

In addition, "a plaintiff alleging fraud by omission is not required to specify the time, place, and specific content of the fraudulent omission because he would not be able to do so."

-9-

*Corson v. Toyota Motor Sales*, 2013 US. Dist. LEXIS 189262, at *11 (C.D. Cal. July 18, 2013) (citing *Baggett v. Hewelett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)) ("Because such a plaintiff is alleging a failure to act instead of an affirmative act, the plaintiff cannot point out the specific moment when the defendant failed to act"); *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007) ("[A] fraud by omission claim can succeed without the same level of specificity required by a normal fraud claim"). An omission can constitute actionable fraud if it is contrary to a representation actually made by the defendant, or a fact the defendant was obligated to disclose. *Corson*, 2013 U.S. Dist. LEXIS 189262, at *12.

Here, Symantec argues that Plaintiff's allegations in support of the UCL "fraudulent" prong, CLRA, and FAL claims fail to satisfy Rule 9(b). Symantec's arguments are without merit. Plaintiff alleges: (a) specific *places* that Symantec made the false and misleading statements (on its website and ecommerce platforms); (b) the specific *reasons* that the statements were false and misleading (the Affected Products were marketed as industry-leading security solutions that would effectively assess vulnerabilities and protect computer systems against the latest online threats, including rootkit, but contrary to those representations, the products suffered from the High Privilege Defect and the Outdated Source Code Defect, prior knowledge of which would have altered Plaintiff's purchase decisions); (c) that Symantec made the false statements during the Class Period; and (d) these statements falsely represented the Affected Products' capabilities and security features. *See Vess*, 317 F.3d at 1106. These allegations suffice to put Symantec on more than adequate notice so it can prepare a defense. *See Swartz*, 476 F.3d at 764; *Rasmussen*, 27 F. Supp. 3d at 1044.

Plaintiff further challenges Symantec's statements not just as affirmative misrepresentations, but as omitting material facts regarding the common defects shared by the Affected Products. For example, "by representing that the Affected Products were reliable for ordinary consumer and business use but concealing the High Privilege Defect and Outdated Source Code Defect, Defendant's conduct was likely to deceive purchasers of antivirus products [and therefore] Defendant's failure to disclose the defects constitutes a material omission in

1   violation of the UCL." ¶ 89. This was information that Symantec had a duty to disclose in light of

2   its other statements and superior knowledge. *See* ¶ 58. Under the applicable law, the particulars of

3   when and where Symantec omitted material information are not essential at the pleading stage.

4   Plaintiff's allegations satisfy the relaxed standard for omission claims. *See Corson*, 2013 US. Dist.

5   LEXIS 189262, at *11.

6              B.   Plaintiff Has Alleged Actionable Misrepresentations.

7              Plaintiff must allege a representation of fact, which constitutes a "specific and

8   measurable claim, capable of being proved false or of being reasonably interpreted as a statement

9   of objective fact." *Rasmussen*, 27 F. Supp. 3d at 1039-40 (citing *Coastal Abstract Serv., Inc. v.

10  First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). "Misdescriptions of specific or

11  absolute characteristics of a product are actionable." *Id.* at 1039. (citing *Cook Perkiss and Liehe,

12  Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)). By contrast, "a challenged

13  claim is non-actionable puffery if it is a generalized, vague, and unspecified assertion upon which

14  a reasonable consumer could not rely." *Id.* (cleaned up). In *Rasmussen*, this Court sampled and

15  compared actionable statements against non-actionable, mere puffery statements. *Id.* at 1041.

16  *Compare, e.g., Annunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1141-42 (C.D. Cal. 2005)

17  (finding actionable statements "that a computer has (1) gone through the 'most stringent quality

18  control tests' and (2) uses 'brand-name components'") *against Oestreicher v. Alienware Corp.*,

19  544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (holding that general representations like "(1) Superb,

20  uncompromising quality, (2) faster, more powerful, (3) higher performance, (4) longer battery life,

21  (5) richer multimedia experience, and (6) faster access to data" are mere puffery) (cleaned up).

22              In the instant motion, Symantec improperly argues that Plaintiff has not alleged any

23  false, actionable misrepresentations. Symantec relies on a prior district court ruling that found

24  statements such as "stay protected," "detects and removes spyware," and "blocks spyware and

25  worms automatically" are not actionable, false statements of fact. *Haskins v. Symantec*, 2014 U.S.

26  Dist. LEXIS 75348, at **7-8 (N.D. Cal. June 2, 2014) (*aff'd*, 654 F. App'x 338 (9th Cir. 2016)).

27  There, the plaintiff sued Symantec on the basis of a breach, in which "[i]n 2006, hackers infiltrated

28

-11-

Symantec's network and stole the source code used in the 2006 versions of [certain Norton software]," and where Symantec publicly disclosed the breach for the first time in 2012. *Haskins v. Symantec Corp.*, 2013 U.S. Dist. LEXIS 169865, at **2-4 (N.D. Cal. Dec. 2, 2013). The plaintiff in *Haskins* alleged that the breach rendered certain security products compromised, in violation of the CLRA, UCL, and other laws. *Id.* at *5. In that specific context, the court in *Haskins* held that the plaintiff failed to show how the source code breach and Symantec's nondisclosure thereof rendered the alleged misrepresentations plausibly false or misleading. *Id.* at **20-21.

Here, Plaintiff's allegations are rooted in a fundamentally different fact pattern, i.e., the High Privilege Defect and the Outdated Source Code Defect. Plaintiff has alleged that Symantec represented that the Norton Products "defend[] you against a broad range of online threats through key technologies, including antivirus, antispyware, rootkit detection, and automatic updates" and provide "enhanced protection" against "viruses, spyware, hackers, rootkits, identity theft, phishing scams, and fraudulent Web sites." ¶¶ 21-22. Plaintiff also alleges that Symantec made similar representations across its product line for the Affected Products. ¶¶ 18-19. Unlike the allegations in *Haskins*, these representations are both highly specific and diametrically opposed to the disclosed defects. They are therefore actionable misdescriptions of specific characteristics. *See Rasmussen*, 27 F. Supp. 3d at 1039.

In describing these allegations, Symantec argues that Plaintiff's failure to plead that the products did not catch viruses or malware, yield exploitation via hacking, or otherwise were not invulnerable shows that there is no allegation of a false or deceptive representation. Symantec further argues that Plaintiff does not allege any manifestation of the alleged defect. In doing so, Symantec conflates the facts here to the allegations in *Haskins* and fails to understand how the representations specified by Plaintiff are rendered false and deceptive. For example, Symantec repeatedly highlighted rootkit detection as a key security feature. *See* ¶¶ 18, 21-22. However, Project Zero's disclosures demonstrated exactly how the High Privilege Defect and the Outdated Source Code Defect failed to provide any adequate rootkit detection and further created the risk of

-12-

"'a clean overflow as root'" on Linux, Mac, and other UNIX systems or 'kernel memory corruption' on Windows systems." ¶ 3. Symantec further represented that its Enterprise Products contained "layers of defense" and could "[s]eparate files at risk from those that are safe, for faster and more accurate malware detection." ¶ 19. However, the High Privilege Defect showed that Symantec's products were unnecessarily assigned the highest privilege levels, thereby unpacking potentially "at risk" files in the most sensitive part of the computer's operating system and were not equipped with industry-standard sandboxing features, which would have isolated applications for analysis from critical parts of the operating system. ¶ 27. Symantec further represented "enhanced protection" against the "latest threats" to "keep you a step ahead of cyberattacks." ¶ 18. Yet, in light of the Outdated Source Code Defect, Symantec had not addressed known threats in a timely manner and, critically, had not taken steps to address publicly known exploits to open-source code used in its AntiVirus Decomposer Engine for at least seven years. ¶ 4. This case stands in stark contrast to *Haskins*, which concerned different representations and different alleged defects. Symantec's reliance on *Haskins* is therefore misplaced. Plaintiff has properly stated actionable misrepresentations.

### C. Plaintiff Has Adequately Alleged Actual Reliance on Symantec's Misrepresentations.

A plaintiff must allege that "the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *In re Tobacco II Cases*, 46 Cal. 4th at 326. A plaintiff need not demonstrate that the misrepresentations were "the sole or even the predominant or decisive factor influencing his conduct," but only that they "played a substantial part" in the plaintiff's decision making. *Id.* Under the UCL, this standing requirement is applicable only to the named plaintiff(s), not to all absent class members. *See id.* at 323 (finding error in a trial court's conclusion that "the absent class members were [ ] required in a UCL action to individually demonstrate standing in order to remain in the class"). Furthermore, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* at 327; *see also Herremans v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 145957,

-13-

1  at *61 (C.D. Cal. Oct. 3, 2014) ("Actual reliance is presumed (or at least inferred) if the omission

2  is material"). In turn, a misrepresentation "is judged to be 'material' if 'a reasonable man would

3  attach importance to its existence or nonexistence in determining his choice of action in the

4  transaction in question.'" *In re Tobacco II Cases*, 46 Cal. 4th at 327.

5       Here, Plaintiff alleges that he relied, to his detriment, on statements that Symantec

6  made about the Norton Products, that they "were equipped with industry-leading technology that

7  provide safe and up-to-date security, when in fact, they used outdated third-party source code and

8  suffered from a core engine defect that exposed entire computer systems to potential malware and

9  other untrusted files." ¶¶ 56, 62. This allegation is bolstered by the obvious materiality of the

10 alleged misrepresentations – the capabilities and security features of an antivirus software. Indeed,

11 Plaintiff alleges that "[h]ad he known that Symantec designed its products with a fundamental core

12 engine defect and did not patch third-party source code, [he] would not have purchased a single

13 security product from Symantec." ¶ 24. In addition, Plaintiff's theory of fraud includes allegations

14 that Symantec not only made material, affirmative misrepresentations about the Affected Products

15 but also made material omissions regarding the defects. Where, as here, a defendant makes

16 material omissions that, if disclosed, would have caused the plaintiff not to purchase the product at

17 issue, plaintiff's reliance is presumed. *See In re Tobacco II Cases*, 46 Cal. 4th at 327; *Herremans*,

18 2014 U.S. Dist. LEXIS 145957, at *61.

19

20       D.   Symantec Had a Duty to Disclose the High Privilege Defect
              and the Outdated Source Code Defect.

21       California courts generally find a duty to disclose when: (1) the defendant is the

22 plaintiff's fiduciary; (2) the defendant has exclusive knowledge of material facts not known or

23 reasonably accessible to the plaintiff; (3) the defendant actively conceals a material fact from the

24 plaintiff; or (4) the defendant makes partial representations that are misleading because some other

25 material fact has not been disclosed. *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp.

26 3d 1051, 1112 (N.D. Cal. Jan. 21, 2015) (citations omitted); *LiMandri v. Judkins,* 52 Cal. App. 4th

27 326, 336 (1997) (quoting *Heliotis v. Schuman*, 181 Cal. App. 3d 646 (1986)). Courts have found

28

-14-

PLAINTIFF'S OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS COMPLAINT
Case No. 3:18-cv-02006-EMC

that the exclusive knowledge factor is satisfied "where defendant 'was in a superior position to know' [the] allegedly concealed fact." *Norcia v. Samsung Telecoms. Am., LLC*, 2015 U.S. Dist. LEXIS 110454, at *23 (N.D. Cal. Aug. 20, 2015) (citing *Falk*, 496 F. Supp. 2d at 1096); *see also Norcia*, 2015 U.S. Dist. LEXIS 110454, at *22 (finding that although certain "source code is public, . . . that does not mean that the information revealed by the source code was easily accessible or understandable to the average consumer").

In a fraudulent omissions case, the plaintiff must show materiality of the non-disclosed fact by alleging that had the omitted information been disclosed, a reasonable consumer would have been aware of it and behaved differently. *See id.; Rasmussen*, 27 F.Supp.3d at 1033. It also "suffices for plaintiffs to provide examples of advertisements similar to those they saw as long as all the advertisements convey the core allegedly fraudulent message." *Id.* at 1044 (citations omitted). Symantec argues that for the omission to be material, the failure must pose safety concerns. This is a misstatement of California law. In *Rutledge v. Hewlett-Packard Co.*, the California appellate court specifically clarified that certain federal courts had misread its prior holdings in *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824 (2006) and *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255 (2006). 238 Cal. App. 4th 1164, 1174 (2015). The *Rutledge* court explained that "neither [case] preclude[s] a duty to disclose material information known to a manufacturer and concealed from a consumer" and further emphasized that it "did not hold that a defect must be related to a safety concern to be material for purposes of fraudulent omission." *Id.*; *see also Norcia*, 2015 U.S. Dist. LEXIS 110454, at *18 (finding that "pursuant to *Rutledge*, the Court rejects defendants' arguments that Samsung's duty to disclose here was limited to defects relating to safety concerns").

Here, Plaintiff has alleged facts showing that the existence of the High Privilege Defect and the Outdated Source Code Defect in the Affected Products was contrary to Symantec's affirmative representations about the Affected Products throughout the Class Period. ¶ 56 (Symantec represented that its products "were equipped with industry-leading technology that provide safe and up-to-date security, when in fact, they used outdated third-party source code and

-15-

suffered from a core engine defect that exposed entire computer systems to potential malware and other untrusted files"); *see also* ¶¶ 18-19, 20-23, 35. Plaintiff has further alleged that "[h]ad he known that Symantec designed its products with a fundamental core engine defect and did not patch third-party source code, [he] would not have purchased a single security product from Symantec." ¶ 24. These allegations are sufficient to establish materiality of the omitted fact and a duty to disclose. *See LiMandri*, 52 Cal. App. 4th at 336.

Further, Plaintiff has alleged that Symantec knew, or was otherwise reckless or willfully blind in not knowing, that its AntiVirus Decomposer Engine suffered from these extremely serious defects. ¶ 40. As the proprietary owner and licensor of the Affected Products, Symantec designed the core engine that supported its entire product line, including the integration of third-party source code. *Id.* Symantec was also aware of the security best practices and that its products failed to comply therewith. *See* ¶ 35. By contrast, Plaintiff only became aware of the High Privilege Defect and the Outdated Source Code Defect through the Project Zero disclosures and Symantec's security advisory on June 28, 2016. ¶ 38. Through no fault or lack of diligence on his part, Plaintiff was completely unaware of the defective AntiVirus Decomposer Engine, which was a material fact as described herein. ¶¶ 37-41. Symantec was, therefore, in a far superior position to know of the omitted facts. *See Falk*, 496 F. Supp. 2d at 1096. Symantec's exclusive knowledge of the core engine design, including the defects therein, gives rise to a duty to disclose. *See In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d at 1112; *Norcia*, 2015 U.S. Dist. LEXIS 110454, at **22-23.

## II.     PLAINTIFF'S REMAINING CLAIMS ARE ADEQUATELY STATED.

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all of the plaintiff's allegations of material fact and construe them in the light most favorable to the plaintiff. *See Williams v. Gerber Prods.*, 523 F.3d 934, 937 (9th Cir. 2008). A complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

-16-

A.    The UCL "Unlawful" and "Unfair" Prongs Are Adequately Stated.

The UCL creates a cause of action for any "unlawful, unfair or fraudulent business act or practice." Cal. Civ. Code § 17200. As the Ninth Circuit has explained, the statute has a very broad scope:

> [The UCL's] coverage has been described as sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law. A practice may be deemed unfair even if not specifically proscribed by some other law. The statute prohibits wrongful business conduct in whatever context such activity might occur. The standard is intentionally broad and allows courts maximum discretion to prohibit new schemes to defraud.

*In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (citations omitted).

Specifically, the "unlawful" prong of the UCL "borrows violations of other laws and treats them as independently actionable." *Daugherty,* 144 Cal. App. 4th at 837. "Virtually any law—federal, state or local—can serve as a predicate for an action" under this prong. *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 663 (2006). Here, Plaintiff sets forth allegations of CLRA and FAL violations in the Complaint, thereby providing the predicate "unlawful" acts to state a claim under the UCL. *See* ¶ 88; *Paulus*, 139 Cal. App. 4th at 663.

Plaintiff also sufficiently pleads actionable unfair acts. A practice is "unfair" if it violates a public policy tied to a specific constitutional, statutory, or regulatory provision. *See In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d at 1116. Under an alternate balancing approach, a practice is also deemed unfair if the harm to the plaintiff outweighs the utility of the defendant's conduct. *Id.* at 1115. However, the balancing inquiry is not suited for the motion to dismiss stage. *See id.* at 1117 (the "cost-benefit analysis the balancing test calls for is not properly suited for resolution at the pleading stage") (cleaned up); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. Feb. 14, 2016) (denying motion to dismiss under the UCL "unfair" prong because the balancing inquiry is not suited for the motion to dismiss stage); *Grace v. Apple*, 2017 U.S. Dist. LEXIS 119109, at *45 (N.D. Cal. Jul. 28, 2017) (similarly finding that

-17-

1   "Apple's argument that Plaintiff's alleged injury is outweighed by Apple's business justifications

2   is not suitable for resolution on a motion to dismiss").

3           Further, the court in *Haskins* found unpersuasive defendant's argument that "since

4   Plaintiff has not shown that she was actually harmed beyond purchasing the allegedly

5   compromised product, she cannot state a claim under the balancing-test approach." 2013 U.S.

6   Dist. LEXIS 169865, at **25-26. Rather, the court found that "it is a cognizable harm to pay more

7   for a product than one would have otherwise paid [and o]n a motion to dismiss, it is at least

8   plausible that that harm is sufficient to satisfy the balancing test approach to 'unfair practices'

9   claims." *Id.* at *26. The court in *Haskins* further rejected the defendant's argument that "Plaintiff's

10  'unfair practices' claim is entirely duplicative of her claim under the 'fraudulent practices' prong"

11  and must fail for the same reasons. *Id.* The *Haskins* court reasoned that "Plaintiff also appears to

12  argue that it was unfair practice for Defendant to sell a product it knew to be compromised,

13  regardless of the content of its advertisements," and therefore, "Plaintiffs claims under the prong

14  are [not] coterminous." *Id.*

15          Here, Plaintiff has specifically alleged that Symantec "violated the legislatively

16  declared policies reflected by California's strong consumer protection and false advertising laws,

17  including the CLRA . . . and the FAL." ¶ 90. Plaintiff has properly pleaded actionable

18  misrepresentations and demonstrated a duty to disclose under these laws. Symantec's violations

19  thereof justify a holding that Symantec's actions were unfair. *See In re Carrier IQ, Inc. Consumer*

20  *Privacy Litig.*, 78 F. Supp. 3d at 1116. Symantec further argues that Plaintiff fails to allege there

21  was any concrete damage, such as data taken or identity stolen, and therefore, there are no facts to

22  justify a holding that Symantec's software design choices were unfair under the UCL. By contrast,

23  Plaintiff alleges that "[h]ad he known that Symantec designed its products with a fundamental core

24  engine defect and did not patch third-party source code, [he] would not have purchased a single

25  security product from Symantec." ¶ 24. The price premium that Plaintiff paid for defective

26  products, which he would not have purchased had he been aware of the dangerous software design

27  that Symantec implemented, is a cognizable harm sufficient to plausibly infer an unfair business

28

-18-

practice at this stage. *See Haskins*, 2014 WL 2450996, at \*26. In any event, the balancing inquiry is a matter of factual determination that is not suitable for resolution at this stage. *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d at 1115; *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d at 990; *Grace*, 2017 U.S. Dist. LEXIS 119109, at \*\*45-46.

### B.   The Song-Beverly Act Claim Is Adequately Stated.

The California Song-Beverly Act provides that with some exceptions, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Civ. Code § 1792. Under the terms of the statute, the sale must occur in California. *Id.* A "sale" is the "passing of title from the seller to the buyer for a price," or a "consignment for sale." Civ. Code § 1791(n). The California appellate court has further held that a sale occurs in California where title to the product passes in California within the meaning of Com. Code § 2401. *See Cal. State Elecs. Ass'n v. Zeos Int'l Ltd.*, 41 Cal. App. 4th 1270, 1275-77 (1996). In turn, Com. Code § 2401 provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance." As such, shipment contracts are presumed under California law, by which "title passes to the buyer at the time and place of shipment." *Darling v. Green*, 2013 U.S. Dist. LEXIS 190615, at \*10 (C.D. Cal. Sep. 25, 2013) (citations omitted). *See also Ambers v. BevMo, Inc.*, 236 Cal. App. 4th 508, 516 (2015) (affirming the trial court's finding that under the website's terms and conditions, plaintiff "became the owner of the purchased items when his credit card was charged upon completion of the online transaction" even though he had arranged for actual pick-up of the items elsewhere).

Under the Song-Beverly Act, an "implied warranty of merchantability" means that the goods "(1) [p]ass without objection in the trade under the contract description, (2) [a]re fit for the ordinary purposes for which such goods are used, (3) [a]re adequately contained, packaged, and labeled, and (4) [c]onform to the promises or affirmations of fact made on the container or label." Civ. Code § 1791.1(a). The "core test of merchantability is fitness for the ordinary purpose for

which such goods are used," which can be shown "if the product is in safe condition and substantially free of defects." *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) (citations omitted). The appellate court in *Mexia* further affirmed that the "implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale," in which case, the warranty is breached "by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 1304-05.

Here, Symantec contends that Plaintiff is a Michigan resident and has made no allegations in the Complaint tying his purchases to California, and therefore, Plaintiff's claim under the Song-Beverly Act must fail. By contrast, Plaintiff alleged at the outset of the Complaint that not only does Symantec operate its principal place of business in California, its "end user license agreements for the Affected Products identify California law as the choice of law for U.S. purchasers." ¶ 11. Furthermore, the license agreements do not provide any terms and conditions that would contravene the presumption of a shipment contract under California law. *See Darling*, 2013 U.S. Dist. LEXIS 190615, at *10. In this regard, Plaintiff's place of residence plays no factor in the assessment of whether the sale occurred in California. Instead, the operative question is whether title to the product passed within the state, which is measured by the time and place at which Symantec, as the seller, completed its performance with respect to Plaintiff's purchases. *See Zeos Int'l Ltd.*, 41 Cal. App. 4th at 1275-77; Com. Code § 2401. Plaintiff transacted online for the purchase of the Second Software, which was consummated on Symantec's website. ¶ 21. Symantec completed its performance when it processed Plaintiff's financial information and provided Plaintiff with a download link for electronic delivery of the Second Software. Therefore, title to the Second Software passed in California. Plaintiff does not allege that title to his Third Software passed in California.

Symantec further contends that Plaintiff makes speculative and conclusory allegations that the High Privilege Defect and the Outdated Source Code Defect made the Affected Products vulnerable to hacking. Contrary to Symantec's arguments, Plaintiff has put forth specific details about the alleged defects and the resulting vulnerabilities. *See e.g.,* ¶ 28 ("Certain vulnerabilities

-20-

resulting from the High Privilege Defect received 'critical' security scores, ranging from 9.0 to 10.0, on the [CVSS]," with "low access complexity, meaning very little knowledge or skill is required to exploit them and that a potential attacker could cause a total shutdown of the affected resource, rendering the resource completely unavailable) (citations omitted) (cleaned up); ¶ 30 ("Symantec's astonishing failure to track new releases of third party code . . . resulted in critical vulnerabilities that caused the products to suffer from low access complexity levels and the risk of a total system shutdown," including "total information disclosure" and "total compromise of system integrity") (cleaned up). The High Privilege Defect and the Outdated Source Code Defect were fundamental defects that undermined the security of millions of computer systems that ran on Symantec's security solutions. Not only did the Affected Products not provide consumers with adequate protection of their computers, as advertised, they served as a threat vector which made consumers' computers more vulnerable to cyberattacks; ¶ 28, 94 These were also latent defects that existed at the time of sale throughout the Class Period and were only discovered through Project Zero's research in 2016. Under the Song-Beverly Act, Symantec breached the implied warranty of merchantability. *See Mexia*, 174 Cal. App. 4th at 1303-05.

### C.   The Claim for Quasi-Contract / Unjust Enrichment Is Adequately Stated.

California courts recognize standalone claims for relief under the equitable doctrine of unjust enrichment. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Under this doctrine, "an individual is required to make restitution if he or she is unjustly enriched at the expense of another," and "the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370–71 (2010). As this Court further explained in *Swearingen v. Healthy Bev., LLC*, the "doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." 2017 U.S. Dist. LEXIS 66938, at **12-13 (N.D. Cal. May 2, 2017). Importantly, the party seeking relief must have "relied to his

-21-

or her detriment on the misrepresentation," and therefore, a plaintiff who cannot state a claim under the UCL, FAL, or CLRA for failure to plead reliance similarly cannot recover under a claim for unjust enrichment. *Id.* at \*\*14-15.

Plaintiff alleges that he conferred non-gratuitous benefits on Symantec by purchasing and licensing defective security products and that Symantec's retention of such benefits under the circumstances is clearly unjust and inequitable. ¶¶ 94-95. Plaintiff properly alleges detrimental reliance, specifying that "[a]bsent Defendant's misleading and deceptive representations regarding the qualities and functionality of the Affected Products, [he] would not have purchased the products at issue or would have paid substantially less for them." ¶ 95. Plaintiff has adequately pleaded reliance under the UCL, FAL, and CLRA, as specified herein, as well as for a claim of quasi contract / unjust enrichment. *See Swearingen*, 2017 U.S. Dist. LEXIS 66938, at \*\*12-13.

## III.   PLAINTIFF HAS ARTICLE III AND STATUTORY STANDING AS TO THE ENTERPRISE PRODUCTS.

### A.   Plaintiff Has Standing to Bring Claims for Enterprise Products He Did Not Purchase.

Symantec argues that Plaintiff cannot represent commercial entities pertaining to the purchase of Enterprise Products that he did not, and could not, purchase as an individual consumer. There is no controlling authority in the Ninth Circuit regarding a plaintiff's standing for products he did not purchase. *Morgan v. Wallaby Yogurt Co.*, 2014 U.S. Dist. LEXIS 34548, at \*22 (N.D. Cal. Mar. 13, 2014). As this Court noted in *Astiana v. Dreyer's Grand Ice Cream, Inc.*, however, "the critical inquiry seems to be whether there is sufficient similarity between the products purchased and not purchased." 2012 U.S. Dist. LEXIS 10137, at \*33 (N.D. Cal. Jul. 20, 2012). *See also Morgan*, 2014 U.S. Dist. LEXIS 34548, at \*\*22-23 (finding that "the majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims . . . based on products he or she did not purchase as long as the products and alleged misrepresentations are substantially similar") (citations omitted). This inquiry depends on "whether the type of claim and consumer injury between products the plaintiff did and did not purchase is substantially similar." *Id.* at \*25 (citing *Ang v. Bimbo Bakers USA, Inc.*, U.S. Dist.

-22-

LEXIS 34443, at **28-29 (N.D. Cal. Mar. 13, 2014)) ("[t]hat determination necessarily focuses on whether the resolution of the asserted claims will be identical between the purchased and unpurchased products")).

Alternatively, some courts "reserve the question of whether plaintiffs may assert claims based on products they did not buy until ruling on a motion for class certification." *Grace*, 2017 U.S. Dist. LEXIS 119109, at *26 (citations omitted); *see also Astiana*, 2012 U.S. Dist. LEXIS 10137, at *37 (finding that in the assessment of different ice cream products, "any concerns of [defendant] and/or the Court about material differences are better addressed at the class certification stage rather than at the 12(b)(6) stage").

Here, Symantec argues that Plaintiff does not have standing with respect to the Enterprise Products and that Plaintiff has not attempted to explain how the myriad different Norton and Enterprise Products are similar. Symantec further contends that whatever similarity there may be in the Affected Products, there is no similarity in the potential injury. Symantec's arguments are without merit. Throughout the instant motion, Symantec entirely ignores Plaintiff's allegations that all of the Affected Products were supported by the defective AntiVirus Decomposer Engine. ¶ 17. This is the *core* engine for all of the Affected Products, which unpacks and scans compressed executable files for potential malicious code and operates as the backbone for both Norton and Enterprise Products. *Id.* Further, the Affected Products constitute the same kind of software, i.e., antivirus security solutions, and were marketed under substantially similar representations about the capabilities and security features of the products. The Norton Products are therefore substantially similar to the Enterprise Products. *See Astiana*, 2012 U.S. Dist. LEXIS 10137, at *33; *Morgan*, 2014 U.S. Dist. LEXIS 34548, at **22-23.

Purchasers of the Affected Products also suffered the same injury, i.e., (over)payment for a product they would not have purchased or would have paid substantially less for. The disgorgement and restitution of all amounts by which Symantec was enriched through its unlawful or wrongful conduct would provide fair and equal relief to all purchasers of the Affected Products. *See Morgan*, 2014 U.S. Dist. LEXIS 34548, at *25. Finally, any further concerns about material

-23-

1  differences in the Affected Products are best reserved for the class certification stage. *See Grace*,

2  2017 U.S. Dist. LEXIS 119109, at *26; *Astiana*, 2012 U.S. Dist. LEXIS 10137, at *37.

3          B.  Symantec's Motion to Strike Is Improper and Should Be Denied.

4          Rule 12(f) permits a court to strike from a pleading "any redundant, immaterial,

5  impertinent, or scandalous matter." Such motions "are not favored and should not be granted

6  unless it is clear that the matter to be stricken could have no possible bearing on the subject matter

7  of the litigation." *Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 U.S. Dist. LEXIS 57348, at

8  **34-35 (N.D. Cal. May 26, 2011) (citation omitted). "If there is any doubt whether the portion to

9  be stricken might bear on the issue in the litigation, the court should deny the motion." *Platte*

10  *Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). This approach stems

11  from the "strong judicial policy favoring resolution on the merits." *U.S. ex rel. Ruhe v. Masimo*

12  *Corp.*, 929 F. Supp. 2d 1033, 1038 (C.D. Cal. 2012). Consequently, the court must view the

13  pleading under attack in the light most favorable to the nonmoving party. *See id.* While a

14  defendant may have a legitimate concerns about onerous discovery obligations due to an

15  expansively written complaint, that is a matter "the Court can address . . . with careful case

16  management and the supervision of discovery." *Clancy v. Bromley Tea Co.*, 2013 U.S. Dist.

17  LEXIS 112722, at *19 (N.D. Cal. Aug. 9, 2013). Ultimately, whether to grant a motion to strike

18  lies within the court's sound discretion. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970,

19  983 (9th Cir. 2010).

20          At issue in Symantec's motion to strike are Plaintiff's entire claims as they relate to the

21  Enterprise Products. Symantec argues that the Enterprise Products are immaterial and impertinent

22  to Plaintiff's claims but wholly ignores, let alone disputes, Plaintiff's allegations that the defective

23  AntiVirus Decomposer Engine supported Symantec's entire product line, including the Norton

24  Products *and* Enterprise Products. ¶ 17. Symantec's Enterprise Products were also similarly

25  marketed as providing unrivaled security features, including analysis tools that "separate[] files at

26  risk from those that are safe, for faster and more accurate malware detection." ¶ 19. These

27  paragraphs are not immaterial or impertinent to Plaintiff's claims. Instead, they arise under the

28

-24-

1    same defective core engine, a defect that Symantec has admitted. ¶ 25. Plaintiff's claims

2    concerning Enterprise Products are therefore proper.

3                                    **CONCLUSION**

4              For the reasons stated above, Symantec's motion to dismiss and to strike portions of

5    the Complaint should be denied. If it is granted in any respect, Plaintiff requests leave to amend.

6

7    Dated: June 18, 2018                    **SCHUBERT JONCKHEER & KOLBE LLP**

8
                                            By: */s/ Willem F. Jonckheer*
9                                           Robert C. Schubert (S.B.N. 62684)
                                            rschubert@sjk.law
10                                          Willem F. Jonckheer (S.B.N. 178748)
                                            wjonckheer@sjk.law
11                                          Noah M. Schubert (S.B.N. 278696)
                                            nschubert@sjk.law
12                                          Cassidy Kim (S.B.N. 315236)
                                            ckim@sjk.law
13                                          Three Embarcadero Center, Suite 1650
14                                          San Francisco, CA 94111
                                            Telephone: (415) 788-4220
15                                          Facsimile: (415) 788-0161

16                                          *Attorneys for Plaintiff Montgomery Beyer*

17

18

19

20

21

22

23

24

25

26

27

28
                                          -25-