ROBERT C. SCHUBERT (S.B.N. 62684)
rschubert@sjk.law
WILLEM F. JONCKHEER (S.B.N. 178748)
wjonckheer@sjk.law
NOAH M. SCHUBERT (S.B.N. 278696)
nschubert@sjk.law
CASSIDY KIM (S.B.N. 315236)
ckim@sjk.law
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

JOHN ARCHIBALD, *admitted pro hac vice*
jarchibald@investigationcounsel.com
INVESTIGATION COUNSEL P.C.
350 Bay Street, Suite 300
Toronto, Ontario   M5H 2S6
Canada
Telephone: (416) 637-3152
Facsimile: (416) 637-3445

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MONTGOMERY BEYER and LINDA CHESLOW, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SYMANTEC CORPORATION,<br><br>Defendant. | Case No. 3:18-cv-02006-EMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT SYMANTEC CORPORATION'S MOTION TO DISMISS**<br><br>Date: February 14, 2019<br>Time: 1:30 p.m.<br>Dept:   Courtroom 5<br>Judge:  Hon. Edward M. Chen |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

SUMMARY OF FACTS ....................................................................................................... 3

I.    SYMANTEC TOUTED ITS PRODUCTS AS INDUSTRY-LEADING  SECURITY
SOLUTIONS. ............................................................................................................. 3

II.   SYMANTEC FAILED TO DESIGN THE ANTIVIRUS DECOMPOSER ENGINE TO
COMPLY WITH THE PRINCIPLE OF LEAST PRIVILEGE. .................................... 3

III.  SYMANTEC PERPETUALLY FAILED TO PATCH THIRD-PARTY  OPEN
SOURCE CODE. ........................................................................................................ 4

IV.   PLAINTIFFS RELIED ON SYMANTEC'S MISREPRESENTATIONS AND
OMISSIONS. .............................................................................................................. 5

ARGUMENT ....................................................................................................................... 6

I.    PLAINTIFFS HAVE ARTICLE III STANDING. ............................................... 6

    A. Plaintiffs Have Sufficiently Alleged an Injury-In-Fact to Establish Article III Standing. 6

    B. Plaintiffs Do Not Need to Allege "Something More" Beyond Overpayment for Norton
    Products that Malfunctioned. ............................................................................. 8

II.   THE UCL "FRAUDULENT" PRONG, CLRA, AND FAL CLAIMS ARE
ADEQUATELY STATED. ......................................................................................... 11

    A. Plaintiffs' Allegations Are Sufficiently Particularized to State a Claim. ....................... 11

    B. Plaintiffs Have Alleged Actionable Misrepresentations .................................................. 13

    C. Symantec Had a Duty to Disclose the High Privilege Defect and the Outdated Source
    Code Defect. ........................................................................................................ 15

III.  PLAINTIFFS' REMAINING CLAIMS ARE ADEQUATELY STATED. .................. 19

    A. The Song-Beverly Act Claim Is Adequately Stated. ....................................................... 19

    B. The UCL "Unlawful" and "Unfair" Prongs Are Adequately Stated. ............................. 22

    C. The Claim for Quasi-Contract / Unjust Enrichment  Is Adequately Stated. .................. 24

CONCLUSION ................................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Ambers v. BevMo, Inc.*,
   236 Cal. App. 4th 508 (2015) ......................................................................................... 19

4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................ 19

5

6

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) .......................................................................................... 24

7

8

*Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*,
   685 F. Supp. 2d 1001 (N.D. Cal. Dec. 8, 2009) ...................................................... 13, 14

9

*Baggett v. Hewelett-Packard Co.*,
   582 F. Supp. 2d 1261 (C.D. Cal. 2007) .......................................................................... 11

10

11

*Braunstein v. Arizona Dep't of Transp.*,
   683 F.3d 1177 (9th Cir. 2012) .......................................................................................... 6

12

13

*Cahen v. Toyota Motor Corp.*,
   147 F. Supp. 3d 955 (N.D. Cal. Nov. 25, 2015) .................................................... 8, 9, 10

14

*Cal. State Elecs. Ass'n v. Zeos Int'l Ltd.*,
   41 Cal. App. 4th 1270 (1996) .................................................................................... 19, 21

15

16

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999) .......................................................................................... 13

17

*Collins v. eMachines*, Inc.,
   202 Cal. App. 4th 249 (2012) ......................................................................................... 16

18

19

*Cook Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
   911 F.2d 242 (9th Cir. 1990) .......................................................................................... 13

20

*Corson v. Toyota Motor Sales*,
   2013 US. Dist. LEXIS 189262 (C.D. Cal. July 18, 2013) ........................................ 11, 12

21

22

*Darling v. Green*,
   2013 U.S. Dist. LEXIS 190615 (C.D. Cal. Sep. 25, 2013) ....................................... 19, 21

23

*Digby Adler Group, LLC v. Mercedes-Benz U.S.A.*,
   2015 U.S. Dist. LEXIS 45523 (N.D. Cal. Apr. 7, 2015) ................................................ 14

24

25

*Durrell v. Sharp Healthcare*,
   183 Cal. App. 4th 1350 (2010) ....................................................................................... 24

26

*Equity Lifestyle Props., Inc. v. San Luis Obispo*,
   548 F.3d 1184 (9th Cir. 2008) .......................................................................................... 7

27

28

*Falk v. General Motors Corp.*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) .............................................................. 12, 16, 19

*Grace v. Apple*,
2017 U.S. Dist. LEXIS 119109 (N.D. Cal. Jul. 28, 2017) .................................................. 23, 24

*Haskins v. Symantec Corp.*,
2013 U.S. Dist. LEXIS 169865 (N.D. Cal. Dec. 2, 2013) ........................................................ 28

*Heckett v. Feeney*,
2011 U.S. Dist. LEXIS 101485 (D. Nev. Sep. 8, 2011) ........................................................... 14

*Heliotis v. Schuman*,
181 Cal. App. 3d 646 (1986) ...................................................................................................... 16

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ...................................................................................................... 6

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ................................................................................... 2, 16, 17, 18

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. Feb. 14, 2016) ................................................................ 23, 24

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. Mar. 15, 2018) ....................................................... 6, 7, 9, 10

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ...................................................................................................... 22

*In re LinkedIn User Privacy Litig.*,
2014 U.S. Dist. LEXIS 42696 (N.D. Cal. Mar. 28, 2014) ........................................................ 9

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ................................................................................................................ 11

*In re Toyota Motor Corp. Unintended Acceleration Litig.*,
790 F. Supp. 2d 1152 (C.D. Cal. May 13, 2011) ....................................................................... 9

*Kowalsky v. Hewelett-Packard Co.*,
771 F. Supp. 2d 1156 (N.D. Cal. 2011) .................................................................................... 11

*L.A. Taxi Cooperative, Inc. v. Uber-Techs., Inc.*,
114 F. Supp. 3d 852 (N.D. Cal. Jul. 17, 2015) ................................................................. 13, 14

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (1997) ....................................................................................................... 16

*LivePerson, Inc. v. [24]7.ai, Inc.*,
2018 U.S. Dist. LEXIS 190918 (N.D. Cal. Oct. 26, 2018) ................................................ 13, 14

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ................................................................................................. 6, 7

*Mexia v. Rinker Boat Co.*,
174 Cal.App.4th 1297 (2009) .............................................................................................. 20, 22

*Microsoft Corp. v. Franchise Tax Bd.*,
  212 Cal. App. 4th 78 (2012) ............................................................................. 17

*Morgan v. Wallaby Yogurt Co.*,
  2014 U.S. Dist. LEXIS 34548 (N.D. Cal. Mar. 13, 2014) .................................. 11

*Nemet v. Volkswagen Grp. of Am., Inc.*,
  2018 U.S. Dist. LEXIS 171598 (N.D. Cal. Oct. 3, 2018) ................................... 10

*Norcia v. Samsung Telecoms. Am., LLC*,
  2015 U.S. Dist. LEXIS 110454 (N.D. Cal. Aug. 20, 2015) ................... 16, 18, 19

*Papasan v. Dometic Corp.*,
  2017 U.S. Dist. LEXIS 178749 (N.D. Cal. Oct. 27, 2017) ................................... 9

*Paulus v. Bob Lynch Ford, Inc.*,
  139 Cal. App. 4th 659 (2006) ...................................................................... 22, 23

*People v. Uber Techs.*,
  2016 Cal. Super. LEXIS 7531 (Cal. Sup. Ct. Mar. 2, 2016) .............................. 13

*Pirozzi v. Apple Inc.*,
  913 F. Supp. 2d 840 (N.D. Cal. Dec. 20, 2012) ............................................. 6, 7

*Rasmussen v. Apple*,
  27 F. Supp. 3d 1027 (N.D. Cal. Mar. 14, 2014) ........................................ passim

*Rutledge v. Hewelett Packard Co.*,
  238 Cal. App. 4th 1164 (2015) ......................................................................... 16

*Software AG, Inc. v. Consist Software Solutions, Inc.*,
  2008 U.S. Dist. LEXIS 19347 (S.D.N.Y. Feb. 21, 2008) .................................. 15

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ....................................................................... 11, 12

*Swearingen v. Healthy Bev., LLC*,
  2017 U.S. Dist. LEXIS 66938 (N.D. Cal. May 2, 2017) ................................ 24, 25

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ..................................................................... 11, 12

*Waller v. Hewlett-Packard Co.*,
  2011 U.S. Dist. LEXIS 145276 (S.D. Cal. Dec. 16, 2011) ................................. 15

*Williams v. Gerber Prods.*,
  523 F.3d 934 (9th Cir. 2008) ............................................................................. 19

*Williams v. Yamaha Motor Co.*,
  851 F.3d 1015 (9th Cir. 2017) ........................................................................... 16

*Wilson v. Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ........................................................................... 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

Cal. Com. Code § 2401 .......................................................................................... 23, 25

**Rules**

Fed. R. Civ. P. 9(b).................................................................................................. 9, 10

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 6

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 19

**Other Authorities**

U.S. Const. art. III ........................................................................................... *passim*

**INTRODUCTION**

This is a consumer class action brought on behalf of purchasers of certain network security software products sold or licensed by Defendant Symantec Corporation ("Symantec"). These allegations arise out of revelations about critical security flaws in the Symantec's security software, as revealed by Project Zero, Google's team of expert cybersecurity analysts dedicated to identifying and resolving "zero-day" vulnerabilities, or flaws in software that can be exploited by hackers. Plaintiffs allege that between December 21, 2005 and September 19, 2016, Symantec's Norton brand consumer products ("Norton Products") and Symantec brand business products ("Enterprise Products," and together with the Norton Products, the "Affected Products") contained critical defects in the AntiVirus Decomposer Engine. This is the core engine common to all the Affected Products that decompresses executable files so that they can then be scanned for malicious code.

Specifically, the AntiVirus Decomposer Engine contained old third-party source code for which there were publicly known security exploits.  Symantec had failed to patch the third-party source code over a several-year period, contrary to cybersecurity best practice which requires timely implementation of security updates to software. In addition, Symantec violated the basic principle of least privilege, another fundamental cybersecurity best practice, by unnecessarily assigning the highest operating system privilege levels to the AntiVirus Decomposer Engine and thus failing to design it to limit the impact of a vulnerability on a computer's operating system. Instead, the core engine unpacked and examined compressed executable files in the most sensitive part of a computer's operating system, thereby exposing millions of computer systems to subversion and the risk of "a clean overflow as root" or "kernel memory corruption," leading to "total system shutdown," "total information disclosure," and "total compromise of system integrity" (cleaned up). As Project Zero aptly described, these defects "[were] as bad as it gets." Because of these critical defects in the AntiVirus Decomposer Engine, the Affected Products did not provide any reasonable level of protection to consumers.  Contrary to the central purpose and function of security software, the Affected Products increased consumers' risk of harm.

1    Plaintiff Montgomery Beyer ("Mr. Beyer") filed his original complaint against Symantec

2 on April 2, 2018. *See* Dkt. No. 1 ("Complaint"). There, Mr. Beyer alleged claims against Symantec

3 under the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"),

4 Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.* ("Song-Beverly Act"), False

5 Advertising Act, Cal. Bus. & Prof. Code § 17500 *et seq.* ("FAL"), and the Unfair Competition

6 Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"). Mr. Beyer also alleged a Quasi-Contract /

7 Unjust Enrichment claim against Symantec. Symantec moved to dismiss the Complaint and to

8 strike allegations related to the Enterprise Products. *See* Dkt. No. 17 ("MTD").

9    The Court denied Symantec's MTD with respect to Mr. Beyer's Second Software Purchase

10 and Symantec's motion to strike. *See* Dkt. No. 39 ("MTD Order"). The Court also dismissed

11 without prejudice Mr. Beyer's claims as to his Third Software Purchase and the Song-Beverly Act

12 claim. *See id.* Subsequently, Symantec sought leave to address two distinct issues in the Court's

13 MTD Order: (1) whether the term "industry leading" was non-actionable puffery, and (2) whether

14 Symantec had a duty to disclose under *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018).

15 *See* Dkt. No. 43. The Court granted Symantec leave by way of responding to the amended

16 complaint. *See* Dkt. No. 50.

17    In the First Amended Complaint, Plaintiffs Montgomery Beyer and Linda Cheslow

18 ("Plaintiffs") allege the same claims as Mr. Beyer did in his Complaint. *See* Dkt. No. 52 ("FAC").

19 Symantec now moves under Rule 12(b)(1) to dismiss Plaintiffs' claims for lack of an injury-in-

20 fact sufficient to establish Article III standing. *See* Dkt. No. 61 ("MTD FAC"). Symantec also

21 moves under Rule 9(b) to dismiss Plaintiff's claims under the UCL's "fraudulent" prong, the

22 CLRA, and the FAL. *See id.* Lastly, Symantec moves under Rule 12(b)(6) to dismiss Plaintiff's

23 remaining claims arising under the UCL's "unlawful" and "unfair" prongs, the Song-Beverly Act,

24 and Quasi Contract / Unjust Enrichment. *See id.* As demonstrated below—and contrary to

25 Symantec's motion—Plaintiffs have the requisite standing to pursue each claim and have

26 adequately stated all alleged claims.

27

28

## SUMMARY OF FACTS

Symantec is a global provider of network security solutions for consumer and home businesses (served under the Norton brand), as well as for mid-size and large organizations (served under the Symantec brand). Symantec's Norton Products and Enterprise Products are uniformly supported by the same AntiVirus Decomposer Engine, which serves as the backbone of Symantec's entire product line. *See* ¶ 18.[1]

### I.   SYMANTEC TOUTED ITS PRODUCTS AS INDUSTRY-LEADING SECURITY SOLUTIONS.

On its website, Symantec marketed its Norton Products as the best cybersecurity solutions available on the market, providing consumers with industry-leading, enhanced protections against the latest online threats to their computers. *See*, *e.g.*, ¶ 19. In addition, Symantec marketed its Enterprise Products as providing "unrivaled security against known, and unknown, threats," such as through Symantec Insight, a proprietary tool that "separate[s] files at risk from those that are safe, for faster and more accurate malware detection." *See* ¶ 20.

### II.   SYMANTEC FAILED TO DESIGN THE ANTIVIRUS DECOMPOSER ENGINE TO COMPLY WITH THE PRINCIPLE OF LEAST PRIVILEGE.

On or about April 18, 2016, Google's Project Zero team notified Symantec that Project Zero had identified critical defects in the AntiVirus Decomposer Engine, a key component of Symantec's Norton and Enterprise Products that unpacks compressed executable files so that they can then be scanned for malicious code. *See* ¶ 2. On June 28, 2016, after months of working with Symantec to verify and resolve the reported issues, Project Zero publicly disclosed that Symantec had utilized a dangerous software design for the AntiVirus Decomposer Engine. *See* ¶¶ 4, 29. Symantec released a related security advisory on the same day, acknowledging the defects and detailing the relevant patches to its customers. *Id.* Given the sheer number of products that required patching, Symantec had to release the updates in phases over a several-month period. *See* ¶ 4. During this time, and throughout the Class Period, millions of consumers and businesses remained unaware that their

---

[1] All ¶ references herein are to the FAC, unless otherwise stated

antivirus software had utterly failed to perform as expected, and instead, had exposed their systems to remote attacks and other easily exploitable security vulnerabilities. *See* ¶ 6.

In particular, Project Zero discovered that Symantec had unnecessarily assigned the highest privilege levels to the file scanning and analysis function of the AntiVirus Decomposer Engine ("High Privilege Defect"). *See* ¶ 29. The High Privilege Defect contravened a key cybersecurity best practice—the principle of least privilege—which states that software should operate using the least amount of privilege necessary to complete the task. *See* ¶ 39. Indeed, Symantec itself had long advised consumers and businesses of the importance of running systems "under the principle of least privilege where possible to limit the impact of exploit by threats." ¶ 40 (detailing similar security advisories going back to 2007). Symantec further failed to implement industry-standard measures, such as sandboxing, to make sure that potential malware and other untrusted files were processed in a secure environment. *See* ¶ 31. This was a critical shortcoming, especially given the "strong evidence that an active black market trade in antivirus exploits exists." ¶ 38. By unnecessarily having the AntiVirus Decomposer Engine unpack and scan files in the most sensitive part of a computer's operating system, the High Privilege Defect rendered the Affected Products a serious threat vector for a wide variety of cyberattacks, including vulnerabilities that required very little knowledge or skill to exploit. *See* ¶ 32.

### III. SYMANTEC PERPETUALLY FAILED TO PATCH THIRD-PARTY OPEN SOURCE CODE.

Project Zero further disclosed that the AntiVirus Decomposer Engine was designed with third-party source code, including libmspack and unrarsrc libraries, and that the third-party open source libraries that Symantec relied on had been updated several times over the years to resolve "hundreds of critical memory corruption bugs." ¶ 33. However, Symantec had failed to implement the source code updates for at least seven years, meaning that the Affected Products were exposed to dozens of public vulnerabilities and exploits, despite patches being readily available from the third-party open source providers ("Outdated Source Code Defect"). *Id.* Symantec's "astonishing [failure to] track new releases of third party code" was a fundamental violation of yet another security best

-4-

practice, i.e., patching, which is routinely emphasized by experts as critical to staying safe online. ¶ 34. As with the High Privilege Defect, Symantec was well aware of the importance of "[k]eep[ing] all operating systems and applications updated with the latest vendor patches," as it had recommended this practice to users of the Affected Products throughout the Class Period. ¶ 40. Symantec's protracted failure to patch resulted in further critical vulnerabilities that exposed millions of computer systems to the risk of total information disclosure and total compromise of system integrity. *See* ¶ 35.

## IV.   PLAINTIFFS RELIED ON SYMANTEC'S MISREPRESENTATIONS AND OMISSIONS.

In making their purchases, Plaintiffs relied on the statements that Symantec made about the industry-leading capabilities and security features of the Norton Products. Based on those statements, Plaintiffs believed that the Norton Products would provide "Award-Winning Protection" by way of "industry-leading" security features that would be "automatically updated" throughout the operative licensing periods. ¶¶ 21-28. Contrary to Symantec's attempt to recast the Complaint and the FAC, Plaintiffs do not allege that the Norton Products would be invulnerable. Rather, Plaintiffs reasonably believed that at minimum, the Norton Products were fundamentally designed to function in the ways they were represented. *See* ¶ 28. To this end, Plaintiffs believed, for example, that the Norton Products were designed to track updates in known corruption bugs and public exploits so that their computer systems would be protected against the latest online threats. *See* ¶¶ 21-28. Plaintiffs further believed that the products they purchased were designed to protect against illegitimate, administrator-level access to their computer systems. *Id.* Given Symantec's representations, Plaintiffs did not know that the Norton Products suffered from a defective engine that ran on outdated third-party source code and failed to operate under the principle of least privilege when scanning unknown and potentially malicious files. *See* ¶ 28. Plaintiffs had no reason to suspect that the Norton Products were not at all designed to successfully carry out the functions represented, nor did they have any reason to suspect that the Norton Products rendered their computer systems even more vulnerable to attack than if they had never installed the software.

1

<u>**ARGUMENT**</u>

2

**I.    PLAINTIFFS HAVE ARTICLE III STANDING.**

3

    A.    <u>Plaintiffs Have Sufficiently Alleged an Injury-In-Fact to</u>

4

        <u>Establish Article III Standing.</u>

5

      Symantec moves to dismiss Plaintiffs' FAC for lack of subject matter jurisdiction, claiming

6

that Plaintiffs have not adequately alleged a concrete and actual injury, and therefore, lack standing

7

under Article III of the U.S. Constitution to pursue relief in this Court. Pursuant to Fed. R. Civ. Proc.

8

12(b)(1), a complaint should be dismissed if the court lacks subject matter jurisdiction over the

9

claims. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). Specifically, "a plaintiff

10

must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual

11

or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

12

of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

13

redressed by a favorable decision." *Id*. It is well established that at the pleading stage, the bar to

14

satisfy standing is low and "general allegations of injury" are sufficient. *Braunstein v. Arizona Dep't*

15

*of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012).

16

      The Ninth Circuit has further held "that when a consumer alleges that he or she would not

17

have purchased property, or would have paid less for it, had the seller not misrepresented the

18

property or failed to disclose its limitations, the consumer has plausibly alleged an injury-in-fact."

19

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d

20

927, 945 (N.D. Cal. Mar. 15, 2018) ("*EcoDiesel Mktg.*") (citing *Hinojos v. Kohl's Corp.*, 718 F.3d

21

1098 (9th Cir. 2013)); *see also Maya*, 658 F.3d at 1069 (finding that it "is a quintessential injury-

22

in-fact" where plaintiffs allege that they "spent money that, absent defendants' actions, they would

23

not have spent"); *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 846-47 (N.D. Cal. Dec. 20, 2012)

24

("Overpaying for goods or purchasing goods a person otherwise would not have purchased based

25

upon alleged misrepresentations by the manufacturer would satisfy the injury-in-fact and causation

26

requirements for Article III standing"). Finally, the "jurisdictional question of standing precedes,

27

28

-6-

and does not require, analysis of the merits." *Maya*, 658 F.3d at 1068 (quoting *Equity Lifestyle Props., Inc. v. San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008)).

Here, Symantec argues that Plaintiffs' claims of economic injury, by way of overpayment for the Affected Products, do not establish an injury-in-fact because they are abstract, conclusory, hypothetical, and conjectural. Symantec further contends that Plaintiffs never bargained for a bug or vulnerability free software, and moreover, that the alleged defects never posed a risk of future harm to anyone. Symantec therefore concludes that Plaintiffs failed to show a concrete and particularized harm as a result of the software vulnerabilities. Symantec's arguments are without merit. Throughout the FAC, Plaintiffs clearly allege that for each Norton Product they purchased, they relied on Symantec's representations regarding the security and reliability of the software. *See*, *e.g.*, ¶¶ 21-28, 67. Plaintiffs further allege that but for Symantec's material misrepresentations and omissions, which obscured critical limitations in Symantec's software, Plaintiffs would not have purchased a single Norton Product or would have paid substantially less. *See*, *e.g.*, *id*. at ¶¶ 28, 46, 95, 99. In other words, Plaintiffs have plainly alleged that they spent money on Norton Products that, absent Defendant's actions, they would not have spent. *See EcoDiesel Mktg.*, 295 F. Supp. at 945; *Maya*, 658 F.3d at 1069. This is a concrete and quintessential injury-in-fact that Plaintiffs incurred at the time of sale of each Norton Product. It is sufficient to establish Article III standing. *See id.*; *Priozzi*, 913 F. Supp. 2d at 846-47.

By contrast, Symantec erroneously tries to define Plaintiffs' economic injury as a measure of a future risk of harm. Symantec argues that there was no exploitation of the alleged vulnerabilities, and therefore, there was no future risk of injury to Plaintiffs or anyone else. Symantec further argues that Plaintiffs seek entitlement to a benefit, i.e., a bug free software, that was never bargained for. Putting aside the premature contention that there was never an exploitation of alleged defects,[2] Symantec misconstrues the basis for Plaintiffs' economic injuries.

---

[2] Plaintiffs' allegations include references to customer posts on Symantec's online forum, reporting a myriad of technical issues throughout the years, including rootkits and virus infections, which may have been caused by the alleged defects. *See* ¶ 39.

In particular, Symantec conflates Plaintiffs' bargain for antivirus software with industry-leading security features and automatic protection updates with one for a perfect software that is free of bugs and vulnerabilities. In fact, Plaintiffs never allege that they expected their Norton Products to be invulnerable and to operate perfectly without error. Rather, Plaintiffs reasonably believed, and have alleged, that they were purchasing security products that would operate at a minimum level of quality, in compliance with fundamental security best practices (that Symantec itself recommended), to protect their computers from viruses, spam, and other online vulnerabilities. *See* ¶ 28. Instead, Plaintiffs received Norton Products that did not provide such protection, and instead, made their computers even more vulnerable to attack because the software contained significant defects in the core decomposer engine, which exposed entire computer operating systems to various security vulnerabilities. *See id.* Symantec also failed to deliver on the benefit of automatic software updates by failing to implement patches for third-party source code in their software. *See id.* These shortcomings directly contravened the benefits that Plaintiffs bargained for at the time of purchase and are sufficient to establish a particularized and concrete injury-in-fact.

B.   Plaintiffs Do Not Need to Allege "Something More" Beyond Overpayment
for Norton Products that Malfunctioned.

Symantec further avers that Plaintiffs lack Article III standing because they do not allege "something more" beyond overpayment for the Norton Products. On this point, Symantec relies on Judge Orrick's ruling in *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 970 (N.D. Cal. Nov. 25, 2015). There, plaintiffs alleged that defendant motor companies equipped their vehicles with computer technology that was susceptible to third-party hacking. *Id*. at 959. Plaintiffs also alleged that despite knowing about these security vulnerabilities, the defendants continued to represent and tout their vehicles as having great safety features. *Id*. Given this, the court in *Cahen* looked to whether plaintiffs had sufficiently alleged an injury-in-fact based on either the risk of future hacking or the alleged economic loss flowing from the risk of future hacking. *Id*. at 966-71. The *Cahen* court ultimately held that plaintiffs lacked standing on both fronts, finding that "when economic loss is predicated solely on how a product functions, and the product has not malfunctioned . . . something

-8-

more is required than simply alleging an overpayment for a 'defective' product." *Id.* at 970 (citing *In re Toyota Motor Corp. Unintended Acceleration Litig.*, 790 F. Supp. 2d 1152, 1166 n. 11 (C.D. Cal. May 13, 2011) ("*In re Toyota Motor*")). For example, this "something more" can be based on allegations of diminution in value based on low resale values. *See In re Toyota Motor*, 790 F. Supp. 2d at 1159, 1162.

As subsequent courts have explained, *Cahen* limited this "something more" requirement to "those plaintiffs who were seeking to establish an economic loss based on a 'market effect' theory." *In re LinkedIn User Privacy Litig.*, 2014 U.S. Dist. LEXIS 42696, at *16 (N.D. Cal. Mar. 28, 2014); *see also Papasan v. Dometic Corp.*, 2017 U.S. Dist. LEXIS 178749, 2017 U.S. Dist. LEXIS 178749, at **19-21 (N.D. Cal. Oct. 27, 2017) (collecting cases that found no injury-in-fact where plaintiffs failed to allege "something more" to support their allegations that their vehicles had somehow diminished in market value). By contrast, "when a complaint includes concrete allegations of a *current universal* vehicle defect . . . those allegations plausibly and specifically support an overpayment theory of injury . . . because 'a vehicle with a defect is worth less than one without a defect.'" *EcoDiesel Mktg.*, 295 F. Supp. 3d at 950 (citing *In re Toyota Motor*, 790 F. Supp. 2d at 1163) (emphasis in original). Additionally, an actual manifestation of an alleged defect is not required to establish standing. *See Cahen*, 147 F. Supp. 3d at 969 (finding that "a manifested defect was not required to establish standing as long as plaintiffs allege a legally cognizable loss under the benefit of the bargain or some other legal theory") (citations omitted); *Papasan*, 2017 U.S. Dist. LEXIS 178749, at *19 (holding that where a "product has not yet failed to perform, 'something more' is required beyond simply alleging overpaying for a defective product" but generally, a plaintiff "does not necessarily need to plead that [a product] defect already manifested").

Here, Symantec argues that Plaintiffs' failure to allege "something more" renders their claims insufficient to establish Article III standing. As before, Symantec misconstrues the bases on which Plaintiffs allege an injury-in-fact by improperly focusing on some future risk of injury via exploitations and potential diminution in the value of the software. As Symantec concedes, Plaintiffs no longer own their Norton Products due to the limited, temporal nature of Symantec's licensing

-9-

agreements. Therefore, there is no comparable resale market that would have provided a basis for measuring a loss in market value. *See Nemet v. Volkswagen Grp. of Am., Inc.*, 2018 U.S. Dist. LEXIS 171598, at *316 (N.D. Cal. Oct. 3, 2018) (citing consumer food cases in which "plaintiffs had no chance to resell [the defective products] and recover their loss," and therefore, "the plaintiffs had plausibly been injured when they purchased [the products]").

Further, unlike in *Cahen*, Plaintiffs' economic injury is not premised on the risk of some future hacking or exploitation of the alleged defects. *See Cahen*, 147 F. Supp. 3d at 969-71 (rejecting vulnerabilities in the electronic security of defendants' vehicles as a proper basis for an injury-in-fact because the underlying risk of injury is speculative). Instead, Plaintiffs have alleged a directly ascertainable, economic loss based on defects that existed at the time of purchase of each Affected Product. *See Cahen*, 147 F. Supp. 3d at 969. These were current and universal defects that affected Symantec's entire product line during the Class Period, and which caused the software to malfunction.[3] *See EcoDiesel Mktg.*, 295 F. Supp. 3d at 950. Specifically, the core decomposer engine operated at unnecessarily high privilege levels and ran on severely outdated third-party source code. *See* ¶¶ 29-33. These defects violated fundamental cybersecurity best practices, made users' computers more vulnerable to attack, and were diametrically opposed to Symantec's representations that the Affected Products were equipped with industry-leading security and automatic update features. *See, e.g.*, ¶¶ 21-28. As a result, Plaintiffs suffered a cognizable, economic loss because they did not receive the full benefit of what they bargained for. Plaintiffs, therefore, have adequately alleged an Article III injury-in-fact.

---

[3] Symantec's reliance on the assertion that no software is free of any bug, defect, or vulnerability is ineffective to support its conclusory argument that there was never any malfunction of the Affected Products. The fact that the Affected Products were updated and patched as an inherent part of software development does not bar the possibility of a malfunction or defect, as Project Zero's disclosures prove.

-10-

## II.   THE UCL "FRAUDULENT" PRONG, CLRA, AND FAL CLAIMS ARE ADEQUATELY STATED.

### A.   Plaintiffs' Allegations Are Sufficiently Particularized to State a Claim.

As the Court noted, Plaintiffs' claims sound in fraud, and therefore, the heightened pleading requirements of Rule 9(b) apply. *See* MTD Order at 7:10-11. Pursuant to Rule 9(b), fraud-based claims must be pleaded with particularity, meaning that claims grounded in fraud must "be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The particularity required in pleading fraud is not intended to be mechanically applied; rather the facts alleged must merely be "enough to give a defendant notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citations omitted); *see also Rasmussen v. Apple*, 27 F. Supp. 3d 1027, 1044 (N.D. Cal. Mar. 14, 2014) (finding that "[w]hile Plaintiff has not expressly alleged the *precise* statements or advertisements upon which he has relied, he has alleged sufficient information . . . [including] examples of similar specific statements from the same sources, to give [Defendant] notice of the nature of the alleged misrepresentations at issue"). Further, the "standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA." *Morgan v. Wallaby Yogurt Co.*, 2014 U.S. Dist. LEXIS 34548, at *41 (N.D. Cal. Mar. 13, 2014) (citing *Kowalsky v. Hewelett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 (N.D. Cal. 2011)). Similarly, the "Supreme Court of California has held [that] a violation of the UCL's fraud prong is also a violation of the false advertising law." *Id.* at *42 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 n. 8 (2009)).

In addition, "a plaintiff alleging fraud by omission is not required to specify the time, place, and specific content of the fraudulent omission because he would not be able to do so." *Corson v. Toyota Motor Sales*, 2013 US. Dist. LEXIS 189262, at *11 (C.D. Cal. July 18, 2013) (citing *Baggett v. Hewelett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)) ("Because such a plaintiff is alleging a failure to act instead of an affirmative act, the plaintiff cannot point out the specific moment when the defendant failed to act"); *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088,

1098-99 (N.D. Cal. 2007) ("[A] fraud by omission claim can succeed without the same level of specificity required by a normal fraud claim"). An omission can constitute actionable fraud if it is contrary to a representation actually made by the defendant, or a fact the defendant was obligated to disclose. *Corson*, 2013 U.S. Dist. LEXIS 189262, at *12.

Here, Plaintiffs allege: (a) the specific *places* that Symantec made the false and misleading statements (on its website, ecommerce platforms, and boxes/packaging); (b) the specific *reasons* that the statements were false and misleading (the Affected Products were marketed as industry-leading security solutions that would effectively assess vulnerabilities and protect computer systems against the latest online threats, including via automatic security updates, but contrary to those representations, the products suffered from the High Privilege Defect and the Outdated Source Code Defect, prior knowledge of which would have altered Plaintiff's purchase decisions); (c) Symantec made the false statements during the Class Period; and (d) these statements falsely represented the Affected Products' capabilities and security features. *See Vess*, 317 F.3d at 1106. These allegations suffice to put Symantec on more than adequate notice so that it can prepare a defense. *See Swartz*, 476 F.3d at 764; *Rasmussen*, 27 F. Supp. 3d at 1044.

In the FAC, Plaintiffs further challenge Symantec's statements not just as affirmative misrepresentations but as omitting material facts regarding the common defects shared by the Affected Products. For example, "by representing that the Affected Products were reliable for ordinary consumer and business use but concealing the High Privilege Defect and Outdated Source Code Defect, Defendant's conduct was likely to deceive purchasers of antivirus products [and therefore] Defendant's failure to disclose the defects constitutes a material omission in violation of the UCL." ¶ 93. This was information that Symantec had a duty to disclose in light of its other statements and superior knowledge. *See id.* at ¶ 46. Under the applicable law, the particulars of when and where Symantec omitted material information are not essential at the pleading stage. Plaintiff's allegations satisfy the relaxed standard for omission claims. *See Corson*, 2013 US. Dist. LEXIS 189262, at *11.

B. <u>Plaintiffs Have Alleged Actionable Misrepresentations.</u>

Plaintiffs must further allege a representation of fact, which constitutes a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Rasmussen*, 27 F. Supp. 3d at 1039-40 (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). "Misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* at 1039 (citing *Cook Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)). By contrast, "a challenged claim is non-actionable puffery if it is a generalized, vague, and unspecified assertion upon which a reasonable consumer could not rely." *Rasmussen*, 27 F. Supp. 3d at 1039 (cleaned up). Importantly, "[n]either consumers nor the Court construe [ ] statements in a vacuum [, and t]he appropriate inquiry is whether, in the context of the challenged statements, a reasonable consumer would perceive a message . . . in a specific way." *LivePerson, Inc. v. [24]7.ai, Inc.*, 2018 U.S. Dist. LEXIS 190918, at *13 (N.D. Cal. Oct. 26, 2018); *see also Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, 685 F. Supp. 2d 1001, 1018 (N.D. Cal. Dec. 8, 2009) (finding that phrases that might be subjective and not measurable in isolation can be actionable when viewed as a whole).

As this Court has already determined, "industry-leading" statements may be actionable non-puffery. *See* MTD Order at 11:1-9 (citing *L.A. Taxi Cooperative, Inc. v. Uber-Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. Jul. 17, 2015) (finding that "Uber has historically described its background check procedures as 'industry-leading'" and that "[a] reasonable consumer reading these statements in the context of Uber's advertising campaign could conclude that an Uber ride is objectively and measurably safer than a ride provided by a taxi or other competitor service"))*; see also People v. Uber Techs.*, 2016 Cal. Super. LEXIS 7531, at **15-16 (Cal. Sup. Ct. Mar. 2, 2016).

Certainly, in the full context of Symantec's representations, consumers would have reasonably believed that the Norton Products would *not* make their computers less secure and more vulnerable to the very risks against which they purchased protection. In this regard, Symantec's reliance on the numerous district court cases from varying jurisdictions is inapposite to support its argument that "industry leading" is non-actionable puffery as an isolated statement. As this Court

has held, "Symantec's statement that its software is 'industry leading' could lead a reasonable consumer to believe that Symantec software[sic] would adhere to industry best practices." MTD Order at 11:2-5. *See also* ¶ 28; *LivePerson, Inc., v. [24]7.ai, Inc.*, 2018 U.S. Dist. LEXIS 190918, at *13. In turn, as this Court has explained, best practices may be sufficiently concrete to be provable. *See id.* at 11:7-9.

Moreover, as alleged in the FAC, the "industry-leading" statements are contextualized by additional representations relating to the various awards that Symantec received for the Affected Products. *See, e.g.*, ¶¶ 22-23, 25-26 (stating that the Affected Products provide "Award-Winning Protection," as acknowledged by LapTop Magazine, PC Magazine, and CNET). In this regard, Symantec relies on a single district court's ruling to argue that such statements are not actionable. *See Digby Adler Group, LLC v. Mercedes-Benz U.S.A.*, 2015 U.S. Dist. LEXIS 45523, at *7 (N.D. Cal. Apr. 7, 2015) (finding insufficient basis for fraud in defendant's claim that certain vans are "award winning vehicles" because the statement, without more, is non-actionable puffery). However, Symantec's representations are readily distinguishable to the extent that they identify specific entities in relation to the awards. *See Heckett v. Feeney*, 2011 U.S. Dist. LEXIS 101485, at **13-14 (D. Nev. Sep. 8, 2011) (finding that the "Voted #1" statement "beg[s] the question: By whom? [and w]ithout answering that critical question there is no specific claim and the statement is simply exaggerated advertising which precludes reliance by consumers"). Unlike the statements in *Digby Adler Group, LLC* and *Heckett*, Symantec's representations sufficiently answer the "By whom?" question, and these additional details provide the basis for a specific and measurable claim, as opposed to a subjective claim that is too vague and general to rely on. *See Rasmussen*, 27 F. Supp. 3d at 1039-40. Further, when properly construed in the full context of Symantec's representations as a whole, a reasonable consumer would perceive that the Affected Products would adhere to industry best practices. *See LivePerson, Inc., v. [24]7.ai, Inc.*, 2018 U.S. Dist. LEXIS 190918, at *13; *Autodesk, Inc.*, 685 F. Supp. 2d at 1018.

Symantec used "industry leading" amongst other quantifiable, specific assertions that describe objectively, verifiable characteristics of the Affected Products, such as the timeliness in

implementing security updates. *See L.A. Taxi Coop., Inc.*, 114 F. Supp. at 861-862. Specifically, Plaintiffs allege that Symantec falsely represented the following: "'[A]utomatic updates' that '[i]ncludes protection updates and new product features as available through the renewal period.'" *See*, *e.g.*, ¶¶ 22, 23, 25. As a preliminary matter, this is easily distinguishable from the representation that the Court previously ruled on, which stated that Symantec's software "defends you against a broad range of online threats through key technologies, including antivirus, antispyware, rootkit detection, and automatic updates." *See* MTD Order at 11:10-16. The Court previously ruled that these are general descriptions, and therefore, non-actionable puffery. *See id.* However, the allegations included in the FAC provide additional details regarding the types of updates and the process by which those updates will be provided to customers. *See Software AG, Inc. v. Consist Software Solutions, Inc.*, 2008 U.S. Dist. LEXIS 19347, at **36-37 (S.D.N.Y. Feb. 21, 2008) (finding that defendant's "statements about its ability to offer ongoing maintenance services for [plaintiff]'s products are misleading statements of fact, not puffery, in that they are not exaggerated boasts, but are, rather, capable of verification"); *Waller v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 145276, at **11-12, n. 2 (S.D. Cal. Dec. 16, 2011) (holding that plaintiff adequately alleged an actionable misrepresentation where defendant's "packaging arguably promises an automatic backup of all files with no user configuration, and that simply isn't how the product works"). Similarly, in the instant case, Symantec represented that the Affected Products would be automatically updated with protection updates and new features throughout the operative licensing period. Yet it failed to deliver on that promise when, over the course of several years, it persistently failed to patch the third-party source code in the Affected Products with available security updates. Plaintiffs have, therefore, alleged a particularized claim that is capable of being verified. *See Waller*, 2011 U.S. Dist. LEXIS 145276, at **11-12.

C.   <u>Symantec Had a Duty to Disclose the High Privilege Defect<br>and the Outdated Source Code Defect.</u>

California courts generally find a duty to disclose when: (1) the defendant is the plaintiff's fiduciary; (2) the defendant has exclusive knowledge of material facts not known or reasonably

-15-

accessible to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations that are misleading because some other material fact has not been disclosed. *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1112 (N.D. Cal. Jan. 21, 2015) (citations omitted); *LiMandri v. Judkins,* 52 Cal. App. 4th 326, 336 (1997) (quoting *Heliotis v. Schuman*, 181 Cal. App. 3d 646 (1986)). Courts have found that the exclusive knowledge factor is satisfied "where defendant 'was in a superior position to know' [the] allegedly concealed fact." *Norcia v. Samsung Telecoms. Am., LLC*, 2015 U.S. Dist. LEXIS 110454, at *23 (N.D. Cal. Aug. 20, 2015) (citing *Falk*, 496 F. Supp. 2d at 1096); *see also Norcia*, 2015 U.S. Dist. LEXIS 110454, at *22 (finding that although certain "source code is public, . . . that does not mean that the information revealed by the source code was easily accessible or understandable to the average consumer").

In the absence of a particular representation, as in a fraudulent omissions case, the plaintiff must show materiality of the non-disclosed fact by alleging that had the omitted information been disclosed, a reasonable consumer would have been aware of it and behaved differently. *See id.*; *Rasmussen*, 27 F. Supp. 3d at 1033. The Ninth Circuit has previously held a plaintiff must further "allege that the design defect caused an unreasonable safety hazard." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143 (9th Cir. 2012). However, as this Court explained in the MTD Order, intervening decisions by the California Court of Appeal have cast doubt as to whether California law imposes a safety hazard requirement. *See*, *e.g.*, *Rutledge v. Hewelett Packard Co.*, 238 Cal. App. 4th 1164, 1174 (2015) (explaining that certain federal courts had misread their prior holdings to require "that a defect must be related to a safety concern to be material for purposes of fraudulent omission"); *Collins v. eMachines*, Inc., 202 Cal. App. 4th 249, 257 (2012) (finding sufficient basis for a CLRA violation where plaintiffs alleged defects in floppy disks that could cause critical data corruption "[b]ecause a floppy disk, at the time of the complaint, was integral to the storage, access, and transport of accurate computer data [and therefore] central to the function of a computer"). In short, the *Rutledge* and *Collins* courts allowed claims to proceed even without "defects related to safety concerns." *Id.*

-16-

1    Most recently, the Ninth Circuit recognized this tension in *Hodsdon v. Mars, Inc.*, 2018 U.S.

2    App. LEXIS 15013, at *11 (9th Cir. 2018). There, plaintiff sued the Mars chocolate manufacturer

3    for failure to disclose the use of child and slave labor in its supply chain. *Id.* at *4. In determining

4    whether or not defendant had a duty to disclose with respect to its labor force, the Ninth Circuit

5    declined to decide "whether the later state-court cases have effectively overruled *Wilson*." *Id.* at *8.

6    Instead, the *Hodsdon* court found that while the safety-hazard requirement may not be necessary in

7    all omission cases, there may be a duty to disclose a physical defect when it affects the central

8    functionality of a product. *Id.* at **13-14. In determining that the use of child or slave labor, while

9    reprehensible, "is not a physical defect at all, much less one related to the chocolate's function as

10   chocolate," the Ninth Circuit concluded that the plaintiff in *Hodsdon* failed to establish a

11   manufacturer's duty to disclose the alleged defects in the supply chain. *Id.* at *13.

12   Here, Plaintiffs do not allege that the High Privilege Defect or Outdated Source Code Defect

13   constitute a safety hazard. *See* FAC; MTD Order at 14:5-7. Therefore, the operative inquiry turns

14   on whether the alleged defects constitute "physical" defects "central" to the Affected Products'

15   function. *See id.* On the first query, under California appellate law, "computer software . . . may be

16   characterized as tangible property" because the software is "'recorded in a physical form which has

17   physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen,

18   and can be perceived by the senses.'" MTD Order at 14:8-11 (citing *Microsoft Corp. v. Franchise*

19   *Tax Bd.*, 212 Cal. App. 4th 78, 87 (2012)). This characterization stands in stark contrast to the use

20   of the child labor in *Hodsdon*, which concerned the process used to manufacture chocolate instead

21   of the chocolate itself. *See* MTD Order at 14:15-16. Here, Plaintiffs do not claim that Symantec

22   should have disclosed the process by which the Affected Products were created—but rather that it

23   omitted that the Affected Products themselves contained critical security vulnerabilities.

24   On the question of "central functionality," Plaintiffs have alleged that the AntiVirus

25   Decomposer Engine is the core engine that unpacked and analyzed compressed executable files for

26   all of the Affected Products. *See, e.g.*, ¶¶ 18, 28. Plaintiffs further allege that the defects in this core

27   engine made users' computers and data less secure and more susceptible to cyberattacks. *See, e.g.*,

28

-17-

¶¶ 7, 32. Indeed, this Court has already determined that Plaintiffs "sufficiently allege[ ] the Defects are central to the function of the Affected Products of safeguarding computers against online threats, virus, spyware, etc." MTD Order at 14:25-26.

Nevertheless, Symantec tries to argue that Plaintiffs must allege something more, including some damage malfunction that renders the Affected Products incapable of use. However, the relevant jurisprudence does not require such an extreme obstruction or interference to use. *See*, *e.g.*, *Norcia v. Samsung Telecoms. Am., LLC*, 2018 U.S. Dist. LEXIS 169521, at *4 (N.D. Cal. Oct. 1, 2018) (finding that "[n]o reasonable person could disagree that 'speed and performance' go to the heart of a smartphone's central function"). Similarly, protection of the user's computer system and data thereon goes to the heart of security software like the Affected Products. Here, Plaintiffs allege they paid for a certain level of protection that they never received and were therefore harmed, regardless of whether there was an actual intrusion or other exploitation of the defects. There is no basis for Symantec's assertion that the lack of an intrusion or malfunction means "the software worked to provide [consumers] that protection." Yet even under Symantec's rule, Plaintiffs have adequately alleged actual damages to customers' computer systems. *See*, *e.g.*, ¶ 24 (describing Mr. Beyer's hard drive failure); ¶ 39 (identifying reports of severe slowdowns and degradation of computer performance, rootkits, and other types of infections related to malware and viruses on Norton's online forum). In short, Plaintiffs have adequately alleged physical defects that affect the central functionality of the Affected Products. *See Hodsdon v. Mars, Inc.*, 2018 U.S. App. LEXIS 15013, at **13-14.

Further, Plaintiffs have alleged that Symantec knew, or was otherwise reckless or willfully blind in not knowing, that its AntiVirus Decomposer Engine suffered from these extremely serious defects. *See* ¶ 45. As the proprietary owner and licensor of the Affected Products, Symantec designed the core engine that supported its entire product line, including the integration of third-party source code. *See id.* Symantec was also aware of the security best practices and that its products failed to comply therewith. *See* ¶¶ 40-41. By contrast, Plaintiffs only became aware of the alleged defects through the Project Zero disclosures and Symantec's security advisory. *See* ¶ 43.

1  Through no fault or lack of diligence on his part, Plaintiff was completely unaware of the defective

2  AntiVirus Decomposer Engine, which was a material fact as described herein. *See* ¶¶ 42-46.

3  Symantec was undeniably in a far superior position to know of the omitted facts, and in fact, this

4  Court has found that it plausibly follows from these allegations that Symantec knew how the

5  Affected Products functioned, including the existence of the defects therein. *See* MTD Order at

6  16:26-17:6; *Falk*, 496 F. Supp. 2d at 1096. Together, with Symantec's longstanding publication of

7  best practices, Symantec had a duty to disclose the alleged defects, which it failed to do. *See In re*

8  *Carrier IQ*, 78 F. Supp. 3d at 1112; *Norcia*, 2015 U.S. Dist. LEXIS 110454, at **22-23.

9  ## III.   PLAINTIFFS' REMAINING CLAIMS ARE ADEQUATELY STATED.

10       On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept

11  as true all of the plaintiff's allegations of material fact and construe them in the light most favorable

12  to the plaintiff. *See Williams v. Gerber Prods.*, 523 F.3d 934, 937 (9th Cir. 2008). A complaint need

13  only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

14  its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

15       A.   The Song-Beverly Act Claim Is Adequately Stated.

16       The California Song-Beverly Act provides that with some exceptions, "every sale of

17  consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and

18  the retail seller's implied warranty that the goods are merchantable." Civ. Code § 1792. Under the

19  terms of the statute, the sale must occur in California. *Id.* A "sale" is the "passing of title from the

20  seller to the buyer for a price," or a "consignment for sale." Civ. Code § 1791(n). The California

21  appellate court has further held that a sale occurs in California where title to the product passes in

22  California within the meaning of Com. Code § 2401. *See Cal. State Elecs. Ass'n v. Zeos Int'l Ltd.*,

23  41 Cal. App. 4th 1270, 1275-77 (1996). In turn, Com. Code § 2401 provides that "[u]nless otherwise

24  explicitly agreed title passes to the buyer at the time and place at which the seller completes his

25  performance." As such, shipment contracts are presumed under California law, by which "title

26  passes to the buyer at the time and place of shipment." *Darling v. Green*, 2013 U.S. Dist. LEXIS

27  190615, at *10 (C.D. Cal. Sep. 25, 2013) (citations omitted)*; see also Ambers v. BevMo, Inc.*, 236

28

-19-

1    Cal. App. 4th 508, 516 (2015) (affirming the trial court's finding that under the website's terms and

2    conditions, plaintiff "became the owner of the purchased items when his credit card was charged

3    upon completion of the online transaction" even though he had arranged for actual pick-up of the

4    items elsewhere).

5          Here, Symantec contends that Plaintiffs' claim under the Song-Beverly Act must fail

6    because it does not sufficiently allege that the software was "sold at retail in this state." By contrast,

7    Plaintiffs allege that Symantec operates its principal place of business in California and that its "end

8    user license agreements for the Affected Products identify California law as the choice of law for

9    U.S. purchasers." ¶ 12. Plaintiffs further allege that the license agreements do not provide any terms

10   and conditions that would contravene the presumption of a shipment contract under California law.

11   *See* ¶ 22, 27; *Darling*, 2013 U.S. Dist. LEXIS 190615, at *10. In this regard, Plaintiffs' places of

12   residence play no factor in the assessment of whether the sale occurred in California. Instead, the

13   operative question is whether title to the product passed within the state, which is measured by the

14   time and place at which Symantec, as the seller, completed its performance with respect to Plaintiff's

15   purchases. *See Zeos Int'l Ltd.*, 41 Cal. App. 4th at 1275-77; Com. Code § 2401. Mr. Beyer transacted

16   online for the purchase of the Second Software, which was consummated on Symantec's website.

17   ¶ 22.[4] Ms. Cheslow transacted online for both her purchases, which were also consummated on

18   Symantec's website. ¶ 27. For each online transaction, Symantec completed its performance when

19   it processed Plaintiffs' financial information and provided Plaintiffs with a download link for

20   electronic delivery of the purchased software. ¶¶ 22, 27. Therefore, title to Mr. Beyer's Second

21   Software and Ms. Cheslow's First and Second Software passed in California.

22         Under the Song-Beverly Act, an "implied warranty of merchantability" means that the goods

23   "(1) [p]ass without objection in the trade under the contract description, (2) [a]re fit for the ordinary

24   purposes for which such goods are used, (3) [a]re adequately contained, packaged, and labeled, and

25   (4) [c]onform to the promises or affirmations of fact made on the container or label." Civ. Code

26

27   _____

     [4] As before, Mr. Beyer does not allege that title to his Third Software passed in California. *See*

28       Dkt. No. 22 at 20:22-23.

§ 1791.1(a). The "core test of merchantability is fitness for the ordinary purpose for which such goods are used," which can be shown "if the product is in safe condition and substantially free of defects." *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) (citations omitted). The "implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale," in which case, the warranty is breached "by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 1304-05. "While a defect must be fundamental to implicate the implied warranty, this does not mean the alleged defect must preclude any use of the product at all . . . [and] a defect can render a product unfit notwithstanding the fact the product at issue could, in a technical sense, perform its base function. *In re Carrier IQ*, 78 F. Supp. 3d at 1109 (citations omitted); *see e.g., In re Carrier IQ*, 78 F. Supp. 3d at 1109 (finding that with respect to a defective seat buckle, the product was unfit for its ordinary purpose, despite providing "adequate protective restraint," since consumers reasonably "expect that they would be able to quickly unlatch the harness or buckle in case of an emergency").

Symantec further contends that Plaintiffs fail to allege that the Affected Products did not catch viruses, spyware, or other malware, and as such, Plaintiffs' claim that the High Privilege Defect and the Outdated Source Code Defect made the Affected Products unfit for ordinary use is conclusory. Contrary to Symantec's arguments, Plaintiffs have put forth specific details about the alleged defects and the resulting vulnerabilities. *See*, *e.g.*, ¶ 32 ("Certain vulnerabilities resulting from the High Privilege Defect received 'critical' security scores, ranging from 9.0 to 10.0, on the [CVSS]," with "low access complexity, meaning very little knowledge or skill is required to exploit them and that a potential attacker could cause a total shutdown of the affected resource, rendering the resource completely unavailable) (cleaned up); ¶ 34 ("Symantec's astonishing failure to track new releases of third party code . . . resulted in critical vulnerabilities that caused the products to suffer from low access complexity levels and the risk of a total system shutdown," including "total information disclosure" and "total compromise of system integrity") (cleaned up).

While the Affected Products retained some functionalities, in spite of the alleged defects, "the product[s] nonetheless fail[ed] in a significant way to perform as a reasonable consumer would

-21-

expect." *In re Carrier IQ*, 78 F. Supp. 3d at 1109. Much like defective seat belt buckle that this Court referenced in *In re Carrier IQ*, Plaintiffs reasonably expected that the Affected Products would perform the base functions (e.g., analyzing unknown and potentially harmful files and protecting against external cyberattacks), but furthermore, expected that those fundamental protections would not be undermined by critical defects that made consumers' computers more vulnerable to cyberattacks. *See* ¶ 32. Symantec's reliance on the effect of security vulnerabilities on processor speeds and efficiencies, as in *Haucke*, is therefore, unpersuasive. Symantec also knew about these defects at the time of sale throughout the Class Period. *See* ¶ 45; MTD Order at 17:3-4. The defects were later independently discovered and publicly revealed through Project Zero's research in 2016, at which time Symantec finally took steps to address them. Under the Song-Beverly Act, Symantec breached the implied warranty of merchantability. *See Mexia*, 174 Cal. App. 4th at 1303-05.

   B.   The UCL "Unlawful" and "Unfair" Prongs Are Adequately Stated.

   The UCL creates a cause of action for any "unlawful, unfair or fraudulent business act or practice." Cal. Civ. Code § 17200. As the Ninth Circuit has explained, the statute has a very broad scope:

> [The UCL's] coverage has been described as sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law. A practice may be deemed unfair even if not specifically proscribed by some other law. The statute prohibits wrongful business conduct in whatever context such activity might occur. The standard is intentionally broad and allows courts maximum discretion to prohibit new schemes to defraud.

*In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (citations omitted).

   Specifically, the "unlawful" prong of the UCL "borrows violations of other laws and treats them as independently actionable." *Daugherty,* 144 Cal. App. 4th at 837. "Virtually any law—federal, state or local—can serve as a predicate for an action" under this prong. *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 663 (2006). Here, Plaintiff sets forth allegations of CLRA and FAL violations in the Complaint, thereby providing the predicate "unlawful" acts to state a claim under the UCL. *See* ¶ 92; *Paulus*, 139 Cal. App. 4th at 663.

-22-

1    Plaintiffs also sufficiently plead actionable unfair acts. A practice is "unfair" if it violates a

2    public policy tied to a specific constitutional, statutory, or regulatory provision. *See In re Carrier*

3    *IQ*, 78 F. Supp. 3d at 1116. Under an alternate balancing approach, a practice is also deemed unfair

4    if the harm to the plaintiff outweighs the utility of the defendant's conduct. *Id.* at 1115. However,

5    the balancing inquiry is not suited for the motion to dismiss stage. *See id.* at 1117 (the "cost-benefit

6    analysis the balancing test calls for is not properly suited for resolution at the pleading stage")

7    (cleaned up); *In re Anthem, Inc. Data Breach Litig.,* 162 F. Supp. 3d 953, 990 (N.D. Cal. Feb. 14,

8    2016) (denying motion to dismiss under the UCL "unfair" prong because the balancing inquiry is

9    not suited for the motion to dismiss stage); *Grace v. Apple*, 2017 U.S. Dist. LEXIS 119109, at *45

10   (N.D. Cal. Jul. 28, 2017) (similarly finding that "Apple's argument that Plaintiff's alleged injury is

11   outweighed by Apple's business justifications is not suitable for resolution on a motion to dismiss").

12   Further, the court in *Haskins v. Symantec Corp.* found unpersuasive defendant's argument

13   that "since Plaintiff has not shown that she was actually harmed beyond purchasing the allegedly

14   compromised product, she cannot state a claim under the balancing-test approach." 2013 U.S. Dist.

15   LEXIS 169865, at **25-26 (N.D. Cal. Dec. 2, 2013)). Rather, the court found that "it is a cognizable

16   harm to pay more for a product than one would have otherwise paid [and o]n a motion to dismiss,

17   it is at least plausible that that harm is sufficient to satisfy the balancing test approach to 'unfair

18   practices' claims." *Id.* at *26. The court in *Haskins* further rejected the defendant's argument that

19   "Plaintiff's 'unfair practices' claim is entirely duplicative of her claim under the 'fraudulent

20   practices' prong" and must fail for the same reasons. *Id.* The *Haskins* court reasoned that "Plaintiff

21   also appears to argue that it was unfair practice for Defendant to sell a product it knew to be

22   compromised, regardless of the content of its advertisements," and therefore, "Plaintiffs claims

23   under the prong are [not] coterminous." *Id.*

24   Here, Plaintiffs have specifically alleged that Symantec "violated the legislatively declared

25   policies reflected by California's strong consumer protection and false advertising laws, including

26   the CLRA . . . and the FAL." ¶ 94. Plaintiffs have properly pleaded actionable misrepresentations

27   and demonstrated a duty to disclose under these laws. Symantec's violations thereof justify a holding

28

-23-

that Symantec's actions were unfair. *See In re Carrier IQ*, 78 F. Supp. 3d at 1116. Symantec further argues that Plaintiffs fail to allege there was any concrete damage, such as data taken or identity stolen, and therefore, there are no facts to justify a holding that Symantec's software design choices were unfair under the UCL. By contrast, Plaintiffs allege that "[h]ad they known that Symantec designed its products with a fundamental core engine defect and did not patch third-party source code, [they] would not have purchased a single security product from Symantec." ¶ 28. The price premium that Plaintiffs paid for defective products, which they would not have purchased had he been aware of the dangerous software design that Symantec implemented, is a cognizable harm sufficient to plausibly infer an unfair business practice at this stage. *See Haskins*, 2014 WL 2450996, at \*26. In any event, the balancing inquiry is a matter of factual determination that is not suitable for resolution at this stage. *In re Carrier IQ*, 78 F. Supp. 3d at 1115; *In re Anthem, Inc. Data Breach Litig.,* 162 F. Supp. 3d at 990; *Grace*, 2017 U.S. Dist. LEXIS 119109, at \*\*45-46.

C.   The Claim for Quasi-Contract / Unjust Enrichment
     Is Adequately Stated.

California courts recognize standalone claims for relief under the equitable doctrine of unjust enrichment. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Under this doctrine, "an individual is required to make restitution if he or she is unjustly enriched at the expense of another," and "the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370–71 (2010). As this Court further explained in *Swearingen v. Healthy Bev., LLC*, the "doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." 2017 U.S. Dist. LEXIS 66938, at \*\*12-13 (N.D. Cal. May 2, 2017). Importantly, the party seeking relief must have "relied to his or her detriment on the misrepresentation," and therefore, a plaintiff who cannot state a claim under the UCL, FAL, or CLRA for failure to plead reliance similarly cannot recover under a claim for unjust enrichment. *Id.* at \*\*14-15.

-24-

1   Plaintiffs allege that they conferred non-gratuitous benefits on Symantec by purchasing and

2   licensing defective security products and that Symantec's retention of such benefits under the

3   circumstances is clearly unjust and inequitable. ¶¶ 98-99. Plaintiffs properly allege detrimental

4   reliance, specifying that "[a]bsent Defendant's misleading and deceptive representations regarding

5   the qualities and functionality of the Affected Products, [they] would not have purchased the

6   products at issue or would have paid substantially less for them." ¶ 99. Plaintiffs have adequately

7   pleaded reliance under the UCL, FAL, and CLRA, as specified herein, as well as for a claim of quasi

8   contract / unjust enrichment. *See Swearingen*, 2017 U.S. Dist. LEXIS 66938, at **12-13.

9                                    **CONCLUSION**

10   For the reasons stated above, Symantec's motion to dismiss the FAC should be denied. If it

11   is granted in any respect, Plaintiffs request leave to amend.

12

13   Dated: January 11, 2018          By: ___*/s/ Willem F. Jonckheer*_____

14                                    ROBERT C. SCHUBERT (S.B.N. 62684)
                                      WILLEM F. JONCKHEER (S.B.N. 178748)
15                                    NOAH M. SCHUBERT (S.B.N. 278696)
                                      CASSIDY KIM (S.B.N. 315236)
16                                    **SCHUBERT JONCKHEER & KOLBE LLP**
                                      Three Embarcadero Center, Suite 1650
17                                    San Francisco, California 94111
                                      Telephone: (415) 788-4220
18                                    Facsimile: (415) 788-0161

19                                    JOHN ARCHIBALD, *admitted pro hac vice*
                                      **INVESTIGATION COUNSEL P.C.**
20                                    350 Bay Street, Suite 300
                                      Toronto, Ontario   M5H 2S6
21                                    Canada
                                      Telephone: (416) 637-3152
22                                    Facsimile: (416) 637-3445
                                      *Attorneys for Plaintiffs*
23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT SYMANTEC          Case No. 3:18-cv-02006-EMC
CORPORATION'S MOTION TO DISMISS