1  LAURENCE PULGRAM (CSB No. 115163)
   lpulgram@fenwick.com
2  TYLER NEWBY (CSB No. 205790)
   tnewby@fenwick.com
3  MOLLY MELCHER (CSB No. 272950)
   mmelcher@fenwick.com
4  CIARA N. MCHALE (CSB No. 293308)
   cmchale@fenwick.com
5  FENWICK & WEST LLP
   555 California Street, 12th Floor
6  San Francisco, CA  94104
   Telephone:     415.875.2300
7  Facsimile:     415.281.1350

8  Attorneys for Defendant
   SYMANTEC CORPORATION
9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  MONTGOMERY BEYER, and LINDA          Case No.: 3:18-cv-02006-EMC
    CHESLOW, Individually and on Behalf of all
15  Others Similarly Situated,           **DEFENDANT SYMANTEC**
                                         **CORPORATION'S NOTICE OF**
16              Plaintiff,               **MOTION AND MOTION TO DENY**
                                         **CLASS CERTIFICATION AS TO ALL**
17       v.                              **PUTATIVE CLASS MEMBERS**
                                         **SUBJECT TO ARBITRATION**
18  SYMANTEC CORPORATION,                **AGREEMENTS AND TO STRIKE OR**
                                         **MODIFY CLASS DEFINITION**
19              Defendant.
                                         Date:      March 14, 2019
20                                       Time:      1:30 p.m.
                                         Dept:      Courtroom 5, 17th Floor
21                                       Judge:     The Hon. Edward M. Chen

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DENY CLASS CERTIFICATION AND STRIKE OR MODIFY CLASS DEFINITION ................................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.      ISSUES TO BE DECIDED ....................................................................................... 1

II.     INTRODUCTION ..................................................................................................... 1

III.    STATEMENT OF FACTS ........................................................................................ 2

        A.      The Parties .................................................................................................... 2

                1.      Symantec and Its Products and Services ........................................... 2

                2.      Plaintiff Montgomery Beyer ............................................................. 3

                3.      Plaintiff Linda Cheslow ..................................................................... 3

                4.      The Class Definition and Alleged Causes of Action ......................... 3

        B.      The Arbitration Provisions in the Applicable EULAs and TOS .................. 4

                1.      Applicable EULAs ............................................................................. 4

                2.      Applicable TOS ................................................................................. 6

        C.      Post-Arbitration Purchasers' Agreement to Arbitrate ................................. 6

                1.      Overview of Online Purchase Flows ................................................. 7

                        a.      February 2012–June 2015 ...................................................... 7

                        b.      June 2015–October 2016 ........................................................ 8

                2.      Overview of Download and Installation Processes ........................... 9

                        a.      February 2012–September 2014 ............................................. 9

                        b.      September 2014–May 2016 .................................................. 10

                        c.      May 2016–October 2016 ...................................................... 12

                3.      Overview of Download and Installation Processes for Free Products ...... 12

IV.     ARGUMENT .......................................................................................................... 12

        A.      A Significant Portion of the Putative Class Must Arbitrate Their Claims against Symantec on an Individual Basis ............................................................... 12

FENWICK & WEST LLP
ATTORNEYS AT LAW

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

1. The Post-Arbitration Purchasers and Symantec Entered Into Valid Agreements to Arbitrate ........................................................................... 12

2. Arbitration is a Favored Mechanism under Federal Law ......................... 14

3. The FAA Governs the Arbitration Clauses at Issue in this Dispute ........ 14

4. An Arbitrator Should Decide Any Threshold Questions of Arbitrability. 15

5. Even if the Court Decides Arbitrability, the Claims Brought on Behalf of the Post-Arbitration Purchasers Fall Within the Scope of the Arbitration Agreements and the Agreements Are Enforceable ................ 17

    a. The Claims Brought on Behalf of the Post-Arbitration Purchasers Are Covered by the Arbitration Agreements ............. 17

    b. The Arbitration Provisions Are Not Unconscionable ................... 18

B. This Court Should Deny Class Certification as to the Post-Arbitration Purchasers and Strike or Modify the Class Definition to Exclude Them ............ 20

1. This Court May Deny Class Certification and Strike or Modify the Class Definition ........................................................................................ 20

2. The Court Should Deny Class Certification, and the Putative Class Definition Should be Stricken or Modified, Because it Includes Individuals that Cannot Participate in this Action .................................... 21

C. Symantec's Arbitration Agreements Destroy Typicality and Render Plaintiffs Inadequate Class Representatives ........................................................................ 21

D. Class Certification Should be Denied Even if A Named Plaintiff Were Subject to the Arbitration Agreements ................................................................................ 25

V. CONCLUSION ............................................................................................................. 25

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aanderud v. Superior Court*,
13 Cal. App. 5th 880, 891 (2017) ............................................................................16, 18

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ............................................................................................................14

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ............................................................................................................14

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ......................................................................................................14, 17

*Avilez v. Pinkerton Gov't Servs., Inc.*,
596 Fed. Appx. 579 (9th Cir. 2015) ..........................................................................20, 22, 24

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ............................................................................................................14

*Campanelli v. Image First Healthcare Laundry Specialists, Inc.*,
No. 15-CV-04456-PJH, 2018 WL 6727825 (N.D. Cal. Dec. 21, 2018) .......................... *passim*

*Cape Flattery Ltd. v. Titan Maritime, LLC*,
647 F.3d 914 (9th Cir. 2011) ............................................................................................17

*Chin v. Boehringer Ingelham Pharms., Inc.*,
No. 17-cv-03703-JSC, 2017 WL 3977381 (N.D. Cal. Sep. 11, 2017) ...................................18

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ............................................................................................17

*Conde v. Open Door Mktg.*,
223 F. Supp. 3d 949 (N.D. Cal. 2017) ......................................................................20, 23, 24

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ..................................................................................12

*Crook v. Wyndham Vacation Ownership, Inc.*,
No. 13-CV-03669-WHO, 2013 WL 11275036 (N.D. Cal. Nov. 8, 2013) ..............................19

*Dean Witter Reynolds, Inc. v. Superior Court*,
211 Cal. App. 3d 758 (1989) ............................................................................................18

*Diaz v. Intuit, Inc.*,
No. 5:15-cv-01778-EJD, 2017 WL 4355075 (N.D. Cal. Sep. 29, 2017) ..............................17

*DIRECTV, Inc. v. Imburgia*,
136 S. Ct. 463 (2015) ........................................................................................................14

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

**TABLE OF AUTHORITIES**
**(CONTINUED)**

2

3

**Page(s)**

**CASES**

4

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)..................................................................................22

5

*Fagerstrom v. Amazon.com, Inc.*,
   141 F. Supp. 3d 1051 (S.D. Cal. 2015) .................................................................12

6

7

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ..............................................................................................12

8

*Gentry v. Superior Court*,
   42 Cal.4th 443 (2007) ...........................................................................................18

9

10

*Green Tree Fin. Corp.-Ala. v. Randolph*,
   531 U.S. 79 (2000) ................................................................................................17

11

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)..............................................................................22

12

13

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ................................................................................................15

14

*Kin Wah Kung v. Experian Info. Sols., Inc.*,
   No. C 18-00452 WHA, 2018 WL 2021495 (N.D. Cal. May 1, 2018)....................15

15

16

*King v. Capital One Bank (USA), N.A.*,
   No. 3:11-cv-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012) ................21, 23

17

*Loewen v. Lyft, Inc.*,
   129 F. Supp. 3d 945 (N.D. Cal. 2015) .................................................................16

18

19

*Megacorp Logistics v. Turvo, Inc.*,
   No. 18-cv-01240-EMC, 2018 WL 3619656 (N.D. Cal. Jul. 30, 2018) (Chen, J.)....16

20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)..............................................................................................17

21

22

*Nathan v. Symantec Corp.*,
   No. 17CV319332 (Cal. Super. Ct. May 11, 2018)...........................................13, 16

23

*Nevarez v. Forty Niners Football Co.*,
   No. 16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017)........................13

24

25

*Perry v. Thomas*,
   482 U.S. 483 (1987)..............................................................................................14

26

*Peterson v. Lyft, Inc.*,
   No. 16-cv-07343-LB, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018)....................18

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

CASES

*Quinlan v. Macy's Corporate Servs.*,
No. 12-00737, 2013 WL 11091572 (C.D. Cal. Aug. 22, 2013)..............................23

*Rent–A–Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010).................................................................................................15, 16

*Renton v. Kaiser Found. Health Plan, Inc.*,
No. C00-5370RJB, 2001 WL 1218773 (W.D. Wash. Sept. 24, 2001) ...................23

*Rodriguez v. Am. Techs., Inc.*,
136 Cal. App. 4th 1110 (2006) ...............................................................................16

*Sanchez v. Valencia Holding Co.*,
61 Cal.4th 899 (2015) .........................................................................................18, 19

*Santangelo v. Comcast Corp.*,
No. 15-CV-0293, 2017 WL 6039903 (N.D. Ill. Dec. 6, 2017)..............................20

*Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. ___ (2019).................................................................................................15

*Selden v. Airbnb, Inc.*,
No. 16-CV-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016)...................19

*SteppeChange v. VEON Ltd.*,
No. 18-cv-04842-WHO, 2018 WL 6334991 (N.D. Cal. Dec. 5, 2018)...................16

*Sutcliffe v. Wells Fargo Bank, N.A.*,
No. C-11-06595 JCS, 2012 WL 4835325 (N.D. Cal. Oct. 9, 2012) ......................20

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ...................................................................13

*Tan v. Grubhub, Inc.*,
No. 15-CV-05128-JSC, 2016 WL 4721439 (N.D. Cal. July 19, 2016)...........23, 24

*Tschudy v. JC Penney Corp.*,
No. 11CV01011-JM(KSC), 2015 WL 8484530 (S.D. Cal. Dec. 9, 2015) .............23

*United States v. Sutcliffe*,
505 F.3d 944 (9th Cir. 2007)...................................................................................15

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009)...................................................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................21, 22

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

**CASES**

*Woods v. Vector Mktg. Corp.*,
  No. C-14-0264 EMC, 2015 WL 5188682 (N.D. Cal. Sept. 4, 2015) (Chen, J.).......................21

**STATUTES**

9 U.S.C. § 2 ...........................................................................................................................14, 15

9 U.S.C. § 4 ...................................................................................................................................15

**RULES**

Fed. R. Civ. P. 1 ............................................................................................................................25

Fed. R. Civ. P. 23 .................................................................................................................. *passim*

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION TO DENY CLASS CERTIFICATION AND STRIKE OR MODIFY CLASS DEFINITION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 14, 2019, or as soon thereafter as available, in the courtroom of the Honorable Edward M. Chen, located at 450 Golden Gate Avenue, Courtroom 5, 17th Floor, San Francisco, California, 94102, Defendant Symantec Corporation ("Symantec") will and hereby does move for an order denying class certification as to all purchasers of Norton products described herein as being subject to an arbitration agreement with Symantec, and striking or modifying the class definition to exclude them from any proposed class. A significant portion of the putative class entered into binding arbitration agreements with Symantec, in which they agreed to resolve any disputes with Symantec in arbitration (or in small claims court) on an individual basis. Such persons are bound by their arbitration agreements and may not participate in this class action as to such purchases, even if any class were to be certified. Further, to the extent there were any dispute as to their participation, the named Plaintiffs could not appropriately litigate those disputes for them. Plaintiffs allege that they made their purchases pursuant to end user license agreements that did not contain arbitration provisions and therefore fail to satisfy the typicality and adequacy requirements of Rules 23(a)(3) and (4) of the Federal Rules of Civil Procedure to represent such persons subject to arbitration agreements. Thus, all such users or purchasers of Norton Software should be excluded from the class.

This Motion is made pursuant to Rules 23(c) and (d) of the Federal Rules of Civil Procedure. It is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Amy Chiang, Raja Vudityala, and Dong Chung, the pleadings and papers on file in this action, any other such matters upon which the Court may take judicial notice, the arguments of counsel, and any other matter that the Court may properly consider.

1

Dated:    January 17, 2019                    FENWICK & WEST LLP

2

3                                                          By: */s/ Laurence F. Pulgram*
                                                                Laurence F. Pulgram
4
                                                          Attorneys for Defendant Symantec Corporation
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    ISSUES TO BE DECIDED**

3
4
5

1.    Whether class certification should be denied as to all putative class members described herein to the extent they agreed to arbitrate their disputes with Symantec, and the putative class definition stricken or modified to exclude such putative class members.

6

**II.    INTRODUCTION**

7
8
9
10
11
12

Plaintiffs filed this lawsuit as a putative class action spanning dozens of products and eleven years, from December 21, 2005 through September 19, 2016.  Yet, a significant portion of the putative class entered into binding arbitration agreements with Symantec to resolve their disputes through arbitration (or small claims court), on an individual, non-class basis.  This Motion seeks to exclude Norton purchasers who have arbitration agreements from participation in this action and membership in any proposed class in contravention of their agreements.[1]

13
14
15
16
17
18
19
20
21

Beginning in 2012, the Norton end user license agreements ("EULAs"), which governed purchase, license, and use of the Norton software (including the alleged Affected Products) included binding arbitration agreements.  The putative class members who, as described below, purchased, downloaded, and/or installed Norton software from 2012 through September 19, 2016, (together, as to purchases subject to arbitration agreements, the "Post-Arbitration Purchasers") agreed to the EULAs, including the arbitration agreements, numerous times before they could use the software.  In addition to agreeing to arbitration when they agreed to the EULAs, putative class members who purchased Norton Software online after April 2015 also agreed to the Norton Terms of Sale ("TOS"), which, like the EULAs, contained a binding arbitration agreement.

22
23
24
25
26

Each of these arbitration agreements mandates that any dispute, claim, or controversy arising out of or relating in any way to the software or services provided under the license shall be resolved in small claims court or through individual, binding arbitration before an American Arbitration Association ("AAA") arbitrator.  The Federal Arbitration Act ("FAA") and Supreme Court authority applying it leave no doubt that arbitration provisions like these, including a class

27
28

[1] Because most of the Enterprise (business) purchasers who are also purportedly encompassed in the putative class did *not* enter into arbitration agreements, or entered into individually negotiated agreements rather than standard forms, this Motion does not address Enterprise customers.

FENWICK & WEST LLP
ATTORNEYS AT LAW

action waiver, are valid and enforceable.  There is also no reasonable dispute that the claims Plaintiffs seek to assert on behalf of the Post-Arbitration Purchasers are within the broad scope of the arbitration agreements, as each claim relates to Norton software they allegedly purchased or licensed from Symantec.

The Post-Arbitration Purchasers' arbitration agreements bar their participation in this lawsuit and preclude certification of a class using the First Amended Complaint's ("FAC") proposed class definition.  Moreover, because the named Plaintiffs allege they purchased Norton software before Symantec added mandatory arbitration agreements, to the extent there were any dispute as to the enforceability of other class members' agreements (there is not), the named Plaintiffs could not satisfy the typicality and adequacy requirements of Rules 23(a)(3) and (4) so as to litigate those disputes.  Symantec thus requests that all Post-Arbitration Purchasers be excluded from this action and from the alleged class definition as to purchases subject to arbitration agreements.  By doing so now, the parties and the Court will avoid unnecessary and wasteful class discovery and certification proceedings relating to tens of millions of putative class members who agreed to arbitration.

## III.   STATEMENT OF FACTS

### A.   The Parties

#### 1.   Symantec and Its Products and Services

Symantec, headquartered in Mountain View, California, provides security, storage, and systems management to consumers, small businesses, and large global organizations through its antivirus, data management utility and enterprise software products.  FAC (Dkt. No. 52) ¶ 12.

Symantec's Norton-branded solutions provide multi-layer security for desktops, mobile operating systems, and home networks, defending against online threats to individuals, families, and small businesses.  Declaration of Amy Chiang in Support of Defendant Symantec Corp.'s Motion to Deny Class Certification and Strike or Modify Class Definition ("Chiang Decl.") ¶ 4. Symantec sells Norton security software, products and services on its websites, www.symantec.com, and us.norton.com, as well as in retail outlets like Best Buys.  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

### 2.      Plaintiff Montgomery Beyer

Plaintiff Montgomery Beyer alleges that, in March 2007, he purchased a Dell desktop computer equipped with the Norton 360 software.  *Id.* at ¶ 21.  Mr. Beyer does not seek recovery for the Beyer First Software.  *Id.*  Next, Mr. Beyer claims that when the Beyer First Software expired, he purchased an upgrade in March 2009 to Norton 360 Premier, v. 2.0 through Symantec's website.  *Id.* at ¶ 22.  Mr. Beyer alleges that same year he bought another copy of Norton 360 Premier, v. 2.0 at a Best Buy store.  *Id.* at ¶ 23.  Finally, Mr. Beyer alleges that on March 5, 2010, he again renewed the March 2009 software, along with a PC Jump Start Service program, both through Symantec's website.  *Id.* at ¶ 24.  He alleges that he requested and received a refund for these two purchases and does not seek recovery for them here.  *Id.*

### 3.      Plaintiff Linda Cheslow

Plaintiff Linda Cheslow alleges that, on June 7, 2009, she purchased Norton Internet Security software through Symantec's website.  FAC ¶ 25.  On December 16, 2010, Ms. Cheslow alleges she purchased a subscription for the Norton 360 Premier, v. 4.0 software through Symantec's website.  *Id.* at ¶ 26.  Her claims in this action relate only to these two purchases.  *Id.*

### 4.      The Class Definition and Alleged Causes of Action

The FAC alleges violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, and Song-Beverly Consumer Warranty Act ("SBA"), Cal. Civ. Code §§ 1790 *et seq.*  FAC ¶¶ 1-9.  Plaintiffs allege that Symantec sold goods that were not adequately packaged and labeled, and were not fit for their intended, or any other legitimate, use, based on alleged vulnerabilities reported by Google's Project Zero team in 2016.  *Id.* at ¶ 4.  Plaintiffs further allege that Symantec concealed these defects through its marketing, advertising, and packaging of the Norton Products and the Enterprise Products.  *Id.* at ¶ 7.  Although Symantec strongly disputes these allegations and denies that Plaintiffs have any standing to bring claims against Symantec, those disputed issues are not presented in this Motion.

Plaintiffs seek to represent a nationwide class defined as "All persons in the United States

1  and its territories who purchased or licensed an Affected Product between December 21, 2005,

2  and September 19, 2016" and a consumer subclass for Plaintiffs' CLRA and SBA claims, defined

3  as "All persons in the United States and its territories who purchased or licensed a Norton Product

4  between December 21, 2005 and September 19, 2016." FAC ¶¶ 47-48. September 19, 2016 is

5  the date by which the FAC acknowledges that Symantec had addressed the alleged vulnerabilities

6  reported by Project Zero. *Id.* at ¶ 4. The FAC defines Affected Products as Norton and

7  Enterprise security software products "sold or licensed" during the Class Period that contain the

8  "AntiVirus Decomposer Engine." *Id.* at ¶ 1.

9    **B.    The Arbitration Provisions in the Applicable EULAs and TOS**

10       From 2012 through the end of the Class Period,[2] September 19, 2016, the putative class

11  members who purchased, downloaded, and/or installed Norton software products on their

12  computers agreed to be bound by the Norton EULAs and TOS multiple times during such

13  processes.[3] Those agreements mandate that any dispute arising out of or relating in any way to

14  the Norton software or services provided under the license shall be determined by a small claims

15  court or through binding arbitration on an individual basis before the AAA.

16    **1.    Applicable EULAs**

17       As outlined in the Chiang Decl., various EULAs govern the use of different Norton

18  products from 2012 to October 2016, each of which includes a mandatory arbitration dispute

19  resolution provision. *See* Chiang Decl. ¶ 28. Those EULAs are attached as Exhibits A-L to the

20  Chiang Decl. While the EULAs were modified over time, the arbitration provisions were nearly

21  identical during the 2012 through October 2016 time period.

22       The arbitration provisions in the EULAs contained in Exhibits A through L provide:

23    **If You are a U.S. customer, You and Symantec agree that any dispute, claim or**

24

25  [2] Beginning in February 2012, the 2012 N360 EULA contained an arbitration provision. *See* Chiang Decl., ¶ 29, Exh. A. Beginning on or around August 23, 2012, the 2012 Norton EULA contained an arbitration provision. *See id.* at ¶ 31, Exh. C.

26  [3] Plaintiffs expressly invoke the Norton EULAs as governing their own software purchases. *See, e.g.,* FAC ¶¶ 12, 14, 22 ("Symantec's software license agreement identified California law as the choice of law for U.S. purchasers and did not provide any terms and conditions that would contravene the presumption of a shipment contract under California law"); *see also id.* at ¶ 27 (same).

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

**controversy arising out of or relating in any way to the Software and Services or this License Agreement, shall be determined by binding arbitration or small claims court, instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **You agree that, by agreeing to this License Agreement, the U.S. Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision, and that You and Symantec are each waiving the right to a trial by jury or to participate in a class action.** This arbitration provision shall survive termination of this License Agreement and/or the termination of Your Symantec product license.

*Id.* at ¶¶ 29-40, Exhs. A-D, F-G, I at § 11, E, H, J-K at § 9, L at § 12 (emphasis added).[4]

The arbitration agreements contained in Exhibits A-J also specify that AAA rules will govern the arbitration, explain how users can review the applicable rules, and delegate issues of enforceability of the agreement to the arbitrator:

If You are required to pay a filing fee, Symantec will promptly reimburse You for Your payment of the filing fee after arbitration is commenced. **The arbitration will be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this License Agreement, and will be administered by the AAA. The AAA Rules and Forms are available online at www.adr.org or by calling the AAA at 1-800-778-7879.** The arbitrator is bound by the terms of this License Agreement. **All issues are for the arbitrator to decide, including issues relating to the scope and enforceability of this arbitration provision. Unless Symantec and You agree otherwise, any arbitration hearings will take place in the county (or parish) of either the mailing address You provided in Your Notice or, if no address was provided in Your Notice, Your billing address on file.**

Chiang Decl. Exhs. A-D, F-G, I at § 11; Exhs. E, H, J at § 9 (emphasis added).

The 2016 NBRT EULA and 2016 Norton EULA include a substantially similar provision:

**The arbitration will be governed by the Consumer or Commercial Arbitration**

---

[4] The only difference in the arbitration provisions contained in Exhibits A through J is that the 2012 N360 EULA, 2012 N360E EULA and 2012 Norton EULA contained in Exhs. A-C state "Software or this License Agreement" in the first sentence. *See* Chiang Decl., Exhs. A-C at § 11. In the subsequent EULAs contained in Exhs. D-J, the language was modified to "Software *and Services* or this License Agreement." *See id.* at Exhs. D, F-G, I at § 11; Exhs. E, H, J at § 9 (emphasis added). The 2016 NBRT and 2016 Norton EULAs contained in Exhs. K and L contain a substantially similar provision and adds, "If you are a U.S. customer, *and the dispute is not resolved through Symantec customer support,* You and Symantec agree that any *such* dispute…" *See id.* at Exh. K at § 9, L at § 12. The 2016 NBRT and 2016 Norton EULAs also adds a provision relating to the terms for litigating a claim in small claims court. *Id.* Lastly, the 2016 Norton EULA adds the following provision to the introductory paragraph of the EULA: "**BY ENTERING THIS AGREEMENT, YOU AGREE TO RESOLVE ALL DISPUTES WITH SYMANTEC THROUGH SMALL CLAIMS COURTS OR THROUGH ARBITRATION ON AN INDIVIDUAL BASIS RATHER THAN JURY TRIALS OR CLASS ACTIONS (SEE SECTION 12 BELOW).**" *Id.* at Exh. L at § 12 (emphasis in original).

**Rules, as appropriate, of the American Arbitration Association ("AAA") (collectively, the "AAA Rules"), as modified by this License Agreement, and will be administered by the AAA. The AAA Rules and Forms are available online at www.adr.org or by calling the AAA at 1-800-778-7879.** The arbitrator is bound by the terms of this License Agreement. **All issues are for the arbitrator to decide, including issues relating to the scope and enforceability of this arbitration provision.**

**Unless Symantec and You agree otherwise, any arbitration hearings will take place in the county (or parish) of either Your residence or of the mailing address You provided in Your Notice of Claim.**

*Id.* at Exhs. K at § 9.B.b, L at § 12.B.b (emphasis added).  It further provides that Symantec will pay all arbitration filing fees if the user's claim does not exceed $10,000.  *Id.*

Each arbitration agreement further provides that the parties waive the right to prosecute a class or representative action:

**YOU AND SYMANTEC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

*See id.* at Exhs. A-D, F-G, I at § 11, E, H, J-K at § 9.B.d, L at § 12.B.d (emphasis in original).

## 2.      Applicable TOS

In addition to the EULAs, the Norton Terms of Sale effective as of on or around April 16, 2015 ("2015 TOS") include an arbitration provision that is nearly identical to the arbitration provisions in the EULAs contained in Exhs. A-J to the Chiang Decl.  *See* Chiang Decl., ¶¶ 41-43, Exh. M.  The Norton Terms of Sale effective as of on or around March 11, 2016 ("2016 TOS") include an arbitration provision that is nearly identical to the arbitration provision in the 2016 Norton EULA contained in Exh. L to the Chiang Decl.  *See id.* at ¶¶ 44-45, Exh. N.[5]  Norton purchasers were required to agree to these Terms of Sale in addition to the EULAs.

## C.      Post-Arbitration Purchasers' Agreement to Arbitrate

This Motion addresses putative class members who purchased, upgraded, or manually

---

[5] One difference between the 2016 Norton EULA and the 2016 TOS is that the 2016 TOS provide that "You and Symantec agree that any such dispute, claim, or controversy arising out of or relating to the *Offerings or the Site*" shall be arbitrated.  *See* Chiang Decl. ¶ 45, Exh. N at § 10.1. "Offerings" is defined as "products, services, and/or subscriptions."  *Id.* at 1.  The "Site" is defined as "Symantec websites, such as www.norton.com, Norton Store, Norton Account, and any website operated by or on behalf of Symantec."  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

renewed (for simplicity, described herein as "purchased") an allegedly Affected Product from February 2012 (for Norton 360) or August 2012 (for other Norton products) to October 2016; who downloaded such product from September 2014 to October 2016; or who installed any such product on a device from February 2012 (for Norton 360) or September 2012 (for other Norton products) to October 2016, referred to throughout as the Post-Arbitration Purchasers.  Each of these Post-Arbitration Purchasers agreed to the Norton EULAs and the arbitration agreements within them during their purchase and software installation process.  Flowcharts demonstrating the processes followed by Norton purchasers during these periods leading up to the purchasers' agreements to the arbitration provisions in the EULAs and TOS are set forth in Exh. A to the Vudityala Decl. (online purchase process) and Exh. O to the Chiang Decl. (download and installation processes) and are described in greater detail below.

### 1.   Overview of Online Purchase Flows

#### a.   February 2012–June 2015

During the online checkout process from February 2012 to June 2015, purchasers of Norton software were presented with a screen that summarized their billing information and required their agreement to Symantec's EULA and TOS.  Vudityala Decl. ¶¶ 5, 6.  To complete the online purchase, a user had to click on a checkbox next to the language "I have read and agree to the End User License/Services Agreement and Terms of Sale."  *Id.*  The phrases "End User License/Services Agreement" and "Terms of Sale" were displayed prominently in orange font in its own distinct yellow box amongst otherwise black text and linked to the EULA that applied to the particular product(s) or service(s) the purchaser was purchasing and the TOS in effect at the time of purchase.  *Id.*  Below this statement was a button labeled "Continue" that the user was required to click to complete her purchase.  *Id.*  By checking the box stating that the user had read the terms, and by then clicking "Continue," a purchaser advanced in the checkout process, and conveyed her assent to the EULA and TOS.  *Id.*  A purchaser could not have completed the checkout process and purchased a Norton subscription in this time frame without completing these steps.  *Id.* at ¶¶ 5, 6, 9.

*Id.* at ¶ 6; *see also* Vudityala Decl. ¶ 5 (containing a screenshot of the substantially similar billing and payment webpage from February 2012 to September 2014).

### b.      June 2015–October 2016

During the online checkout process between June 2015 and October 2016, Norton purchasers were presented with a screen that summarized their order and requested their agreement to Symantec's EULAs and TOS.  *Id.* at ¶ 7.  The webpage listed the product(s) the customer was purchasing and also contained the following disclosure regarding her subscription:

> By clicking Agree and Place Your Order, you are reaffirming your enrollment in Norton Automatic Renewal Service, agreeing to store your personal and payment information in your Norton Account, and agreeing to the End User License Agreement, Terms of Sale, and the Privacy Statement.

*Id.* (color in original).  Purchasers could not complete the purchase unless they clicked on the button marked "Agree and Place Your Order."  Vudityala Decl. ¶¶ 7, 9.  The phrases "End User License Agreement," "Terms of Sale," and "Privacy Statement" were displayed prominently in

FENWICK & WEST LLP
ATTORNEYS AT LAW

orange font amongst black text set against a white background and linked to the EULA that applied to the particular product(s) or service(s) the user was purchasing, the TOS, and the Privacy Statement in effect at the time of purchase. *Id.* at ¶ 7.  Below this statement was a button labeled "Agree and Place Your Order" that the customer was required to click to complete the purchase. *Id.* at ¶¶ 7, 9.  By clicking "Agree and Place Your Order," the customer completed the checkout process, and conveyed assent to the EULA, TOS, and Privacy Statement. *Id.* at ¶ 7.



A purchaser could not have completed the checkout process and purchased the Norton subscription without completing these steps. *Id.* at ¶ 9.

### 2.    Overview of Download and Installation Processes

#### a.    February 2012–September 2014

From February 2012 to September 2014, after completing any purchase of a Norton security product, the purchaser was required to install the product on the devices of her choice. Chiang Decl. ¶ 7.  When the purchaser completed a purchase online, the purchaser was prompted to download the software. *Id.* at ¶¶ 7-8.  After the purchaser completed the download of the

FENWICK & WEST LLP
ATTORNEYS AT LAW

software and initiated the installer, the purchaser was directed to a screen that stated by clicking the "Agree & Install" button, the purchaser agreed to the Norton EULA. *Id.* at ¶¶ 9, 9.a.



*Id.*; *see also id.* at ¶ 9.b (containing a substantially similar screen from August 2012 to September 2014).

If the purchaser purchased a Norton product on a disc at a retail outlet, the purchaser could install the software by initiating the installer program on the disc and/or by downloading and installing the most updated software from the Norton website. *Id.* at ¶ 11.   If the purchaser initiated the installer program on the disc, the purchaser was directed to a screen nearly identical to the one above (other than the addition of a field for the product key and non-substantive changes such as background color of the screen), which stated that by clicking the "Agree & Install" button, the purchaser agreed to the Norton EULA. *Id.* If the purchaser chose to download and install the software from the Norton website, she would be prompted with the process described in Section 2.a above. *Id.* Purchasers could not install the Norton software on their devices without first clicking that they agreed to the EULA. *Id.* at ¶ 12.

### b.      September 2014–May 2016

From September 2014 to May 2016, after completing any purchase of a Norton security product, the purchaser was required to install and activate the product on the devices of her

FENWICK & WEST LLP
ATTORNEYS AT LAW

choice.  Chiang Decl. ¶ 13.  After a purchaser made an online purchase, she was presented with a

screen that contained a "Get Started" button, which opened to manage.norton.com.  *Id.* at ¶ 14.

Purchasers of discs would be directed to enter their product keys on the same Norton website.  *Id.*

at ¶ 18.   The purchaser was then prompted with a window stating that her subscription was ready.

*Id.* at ¶ 15.   Before she could begin downloading the Norton software, she was presented with a

hyperlink to the EULA then in effect and a notice that by clicking "Agree & Download," she was

agreeing to the EULA.  *Id.*



Once the purchaser downloaded her subscription, she was directed to a screen within the

downloaded software's installer program.  *Id.* at ¶ 16.  This page instructed the purchaser that by

clicking the "Agree & Install" button, she was agreeing to the Norton EULA.  *Id.*



1    In sum, in order to activate her Norton software subscription during this time, a purchaser agreed

2    to the applicable EULA at least twice during the download and installation processes.  *Id.* at ¶ 19.

3                        **c.      May 2016–October 2016**

4           From July 2016 to October 2016, as depicted in the Chiang Decl., the download and

5    installation processes contained largely identical steps as it had between September 2014 and

6    May 2016.  Chiang Decl. ¶¶ 20-25.  To activate her Norton software subscription, a purchaser

7    agreed to the applicable EULA at least twice during the download and installation processes.  *Id.*

8    at ¶ 26.

9               **3.      Overview of Download and Installation Processes for Free Products**

10          During the class period, Symantec also offered various free Norton products available for

11   download from its website.  Declaration of Dong Chung in Support of Defendant Symantec

12   Corp.'s Motion to Deny Class Certification and Strike or Modify Class Definition ("Chung

13   Decl.") ¶¶ 3-7.  As depicted in the Chung Decl., in order to activate such Norton software

14   products, a user agreed to the applicable EULA during the installation process.  *Id.*

15   **IV.   <u>ARGUMENT</u>**

16      **A.    A Significant Portion of the Putative Class Must Arbitrate Their Claims
             against Symantec on an Individual Basis**

17

18          **1.     The Post-Arbitration Purchasers and Symantec Entered Into Valid
                  Agreements to Arbitrate**

19          The Post-Arbitration Purchasers had notice of and affirmatively assented to the arbitration

20   agreements.  Courts "apply ordinary state-law principles that govern the formation of contracts"

21   to determine whether parties agreed to arbitrate.  *First Options of Chicago, Inc. v. Kaplan*, 514

22   U.S. 938, 944 (1995).  Issues of assent are resolved by determining whether a customer is put on

23   "reasonable notice" of its terms and conditions.  *See, e.g.*, *Fagerstrom v. Amazon.com, Inc.*, 141

24   F. Supp. 3d 1051, 1069 (S.D. Cal. 2015).  "Courts have . . . been more willing to find the requisite

25   notice for constructive assent where . . . the user is required to affirmatively acknowledge the

26   agreement before proceeding with use of the website."  *Cordas v. Uber Techs., Inc.*, 228 F. Supp.

27   3d 985, 990 (N.D. Cal. 2017) (alteration added and in original).

28          As described in detail in Section III.C above and in the Chiang, Vudityala, and Chung

Fenwick & West LLP
Attorneys at Law

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  Declarations, the Post-Arbitration Purchasers assented at multiple points to the applicable EULAs

2  and TOS in effect at the time.  These purchasers could never have used the Symantec products

3  without agreeing to the arbitration provisions.  Thus, a significant portion of the putative class

4  must address claims they have concerning the Affected Products through binding, individual

5  arbitration and cannot participate in this putative class action.

6  　　　　Courts routinely find assent to arbitration agreements based on facts similar to those here.

7  For example, the disclosures presented to the Post-Arbitration Purchasers during the online

8  checkout, download, and installation processes are similar to those held to compel arbitration

9  under California law in *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal.

10  2011).  Like this case, the defendant in *Swift* presented a hyperlink to its terms of service

11  containing the arbitration agreement in close proximity to an "I accept" button that the plaintiff

12  was required to click to complete a transaction.  *Id.*; *see also Nevarez v. Forty Niners Football

13  Co.*, No. 16-CV-07013, 2017 WL 3492110, at *8 (N.D. Cal. Aug. 15, 2017) (finding that website

14  operator prominently informed plaintiffs that they agreed to terms of use, by clicking either

15  "Accept and Continue" or "Sign In" to register or sign in to their account, and by clicking

16  "Submit Order" to finalize their purchase).  The primary difference between *Swift* and this case is

17  that the purchasers here clicked buttons demonstrating their assent *multiple* times.  Indeed, a state

18  court recently validated the precise Symantec process used for obtaining assent to the EULAs at

19  issue here, compelling a user who purchased through that process to arbitration.  Order Re:

20  Motion to Compel Arbitration at 4, *Nathan v. Symantec Corp.*, No. 17CV319332 (Cal. Super. Ct.

21  May 11, 2018) ("[L]anguage on the webpage above the button stated in readily apparent text that

22  clicking the button meant Plaintiff agreed with the license agreement and/or terms of sale. (*Ibid.*)

23  This evidence shows Plaintiff took affirmative actions demonstrating agreement with the license

24  agreements and terms of sale, all of which contained arbitration agreements.")

25  　　　　Here, the evidence establishes that the Post-Arbitration Purchasers received conspicuous

26  notice and assented to the arbitration agreements when they purchased, downloaded, and/or

27  installed the software.

28

### 2.     Arbitration is a Favored Mechanism under Federal Law

Federal law strongly supports enforcement of arbitration agreements like the Symantec agreements.  As the U.S. Supreme Court has repeatedly emphasized, the FAA declares a liberal policy favoring the enforcement of arbitration policies, stating that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing 9 U.S.C. § 2).  The FAA does not simply place arbitration agreements on equal footing with other contracts; rather, it "*favor[s]* arbitration agreements."  *Perry v. Thomas*, 482 U.S. 483, 489 (1987) (emphasis added).  "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage.'"  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) ("The [FAA] is a law of the United States, and *Concepcion* is an authoritative interpretation of that Act.  Consequently, the judges of every State must follow it.")

### 3.     The FAA Governs the Arbitration Clauses at Issue in this Dispute

The arbitration provisions in the cited EULAs and TOS are governed by the FAA.  The arbitration provisions explicitly *state* that the FAA governs their interpretation and enforcement, which is sufficient to bring the arbitration provisions within the purview of the FAA.  *See* Chiang Decl., Exhs. A-D, F-G, I at § 11, Exhs. E, H, J-K, M at § 9, Exh. L at § 12.B, Exh. N at § 10.3; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442 (2006).

Moreover, even without an express provision invoking the FAA, the FAA broadly covers arbitration agreements affecting commerce, which the cited EULAs and TOS certainly do.  *See* 9 U.S.C. § 2 (the FAA covers arbitration agreements "evidencing a transaction involving commerce"); *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995) (the FAA covers not just transactions "within the flow of interstate commerce," but also those merely "affecting commerce").  Symantec sells and supports its security software globally, processing

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   users' communications and protecting against intrusions around the nation and the world. These

2   transactions clearly involve and "affect" interstate commerce.  *United States v. Sutcliffe*, 505 F.3d

3   944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate

4   commerce."); *Kin Wah Kung v. Experian Info. Sols., Inc.*, No. C 18-00452 WHA, 2018 WL

5   2021495, at *2 (N.D. Cal. May 1, 2018) (an activity is said to affect commerce without showing

6   any specific effect upon interstate commerce "if in the aggregate the economic activity in

7   question would represent a general practice . . . subject to federal control.'").  Accordingly, the

8   arbitration provisions are governed by the FAA—and by its liberal policy favoring arbitration.

### 4.    An Arbitrator Should Decide Any Threshold Questions of Arbitrability

11      The FAA requires courts to compel arbitration "in accordance with the terms of the

12   agreement" upon motion of either party to the agreement, consistent with the principle that

13   arbitration is a matter of contract.  9 U.S.C. § 4.  In determining whether to compel arbitration,

14   only two "gateway" issues need to be evaluated: (1) whether there exists a valid agreement to

15   arbitrate between the parties; and (2) whether the agreement covers the dispute.  *Howsam v. Dean*

16   *Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002).

17      As discussed below, there is no substantial question as to either of these two gateway

18   issues.  But if there were, then that question would need to be decided by the arbitrator, not by

19   this Court.  Where an arbitration clause states that the arbitrator shall decide these gateway

20   questions of arbitrability, such provisions are valid under Section 2 of the FAA and must be

21   enforced, "leaving any challenge to the validity of the Agreement as a whole for the Arbitrator."

22   *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010)*; see also Schein, Inc. v. Archer &*

23   *White Sales, Inc.*, 586 U.S. ___, 5 (2019) ("When the parties' contract delegates the arbitrability

24   question to an arbitrator, a court may not override the contract.  In those circumstances, a court

25   possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the

26   argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

27   Before reaching these gateway issues itself, the Court must examine whether an arbitration

28   agreement includes a provision that specifically assigns the decision of its enforceability to the

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    arbitrator, and if so, that issue should be decided by the arbitrator.  *Rent–A–Center*, 561 U.S. at

2    69.

3           "Under federal law, the question whether parties have submitted a particular dispute to

4    arbitration is an issue for judicial determination unless the parties clearly and unmistakably

5    provide otherwise."  *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 954 (N.D. Cal. 2015) (internal

6    quotation marks and alterations omitted).  "An arbitration provision that explicitly refers

7    arbitrability questions to an arbitrator is evidence that the parties clearly and unmistakably have

8    referred the arbitrability question to the arbitrator."  *Id.*; *see also Megacorp Logistics v. Turvo,*

9    *Inc.*, No. 18-cv-01240-EMC, 2018 WL 3619656, at *8 (N.D. Cal. Jul. 30, 2018) (Chen, J.).  An

10   arbitration provision's reference to or incorporation of arbitration rules that give the arbitrator the

11   power or responsibility to decide issues of arbitrability may also constitute clear and unmistakable

12   evidence the parties intended the arbitrator to decide those issues.  *See SteppeChange v. VEON*

13   *Ltd.*, No. 18-cv-04842-WHO, 2018 WL 6334991, at *6 (N.D. Cal. Dec. 5, 2018); *Rodriguez v.*

14   *Am. Techs., Inc.*, 136 Cal. App. 4th 1110, 1123 (2006).

15          Here, the arbitration agreements clearly and unmistakably provide that all issues of

16   arbitrability are for the arbitrator to decide, including issues on the scope and enforceability of the

17   relevant arbitration agreements.  First, the express language of the arbitration agreements delegate

18   to the arbitrator questions of arbitrability.  *See* Chiang Decl., Exhs. A-D, F-G, I at § 11, E, H, J-K,

19   M at § 9, L at § 12.B.b, N at § 10.3.2 ("All issues are for the arbitrator to decide, including issues

20   relating to the scope and enforceability of this arbitration provision").  Second, the agreements

21   provide that "[t]he U.S. [FAA] governs the interpretation and enforcement of this arbitration

22   provision" and incorporate the rules of the AAA.  *See id.* at Exhs. A-D, F-G, I at § 11, E, H, J-K,

23   M at § 9, L at § 12, N at § 10.  Both the incorporation of the AAA rules and the plain language of

24   the agreements clearly and unmistakably delegate threshold questions of arbitrability to the

25   arbitrator.  *Loewen*, 129 F. Supp. 3d at 954; *Aanderud v. Superior Court*, 13 Cal. App. 5th 880,

26   891 (2017); *Rodriguez*, 136 Cal. App. 4th at 1123.

27          In *Nathan v. Symantec*, a California trial court affirmed and enforced the identical

28   Symantec delegation clause at issue here.  No. 17cv319332, at 4 ("Here, the agreements provide

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   all issues relating to the scope and enforceability of the arbitration provision are for the arbitrator

2   to decide.").  This Court should similarly grant Symantec's motion on the basis that a significant

3   portion of the putative class agreed to arbitrate any claims against Symantec, and at a minimum

4   would have to arbitrate the issue of arbitrability.

5               **5.       Even if the Court Decides Arbitrability, the Claims Brought on Behalf**
               **of the Post-Arbitration Purchasers Fall Within the Scope of the**
6               **Arbitration Agreements and the Agreements Are Enforceable**

7                    **a.       The Claims Brought on Behalf of the Post-Arbitration**
                         **Purchasers Are Covered by the Arbitration Agreements**
8

9               As discussed above, any questions of arbitrability are for the arbitrator.  And as discussed

10  below (in Section IV.C), because the named Plaintiffs allege that they are not subject to the

11  mandatory arbitration provisions, they lack standing and typicality to challenge the enforceability

12  of the arbitration agreements.  *See, e.g.*, *Campanelli v. Image First Healthcare Laundry*

13  *Specialists, Inc.*, No. 15-CV-04456-PJH, 2018 WL 6727825, at *7 (N.D. Cal. Dec. 21, 2018).

14  For both reasons, there is no need for this Court to determine whether the arbitration agreements

15  are actually enforceable.

16              Nonetheless, if the Court were to address issues of arbitrability, the claims Plaintiffs seek

17  to assert on behalf of the Post-Arbitration Purchasers fall within the broad scope of the arbitration

18  agreements at issue.  *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000);

19  *AT&T Techs., Inc.*, 475 U.S. at 650 (arbitration may "not be denied unless it may be said with

20  positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

21  asserted dispute").  Any doubt as to whether the claims fall within the scope of the Agreements

22  must be "resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

23  *Inc.*, 473 U.S. 614, 625-26 (1985).

24              Here, the arbitration provisions in the EULAs and TOS use paradigmatically expansive

25  clauses, which courts have consistently held to be broad and encompassing.  *See Chiron Corp. v.*

26  *Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1131 (9th Cir. 2000)*; Diaz v. Intuit, Inc.*, No. 5:15-

27  cv-01778-EJD, 2017 WL 4355075, at *3 (N.D. Cal. Sep. 29, 2017); *Cape Flattery Ltd. v. Titan*

28  *Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011) ("We agreed with the Second Circuit that when

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    parties intend to include a broad arbitration provision, they provide for arbitration 'arising out of

2    or relating to' the agreement.").   The Post-Arbitration Purchasers agreed to arbitrate on an

3    individual basis any dispute, claim or controversy arising out of or relating in any way to the

4    products, services, or offerings of Symantec or its Norton website.   Chiang Decl. Exhs. A-D, F-G,

5    I at § 11, E, H, J-K, M at § 9, L at § 12, N at § 10.   All of the users' claims against Symantec are

6    encompassed by these provisions as they arise from their purchase, license, and/or use of Norton

7    security software from the Norton website or a retail store.   *See* FAC ¶¶ 1-9.   As a result, the

8    Post-Arbitration Purchasers are obligated to arbitrate any disputes with Symantec.

9                   **b.       The Arbitration Provisions Are Not Unconscionable**

10                 When a plaintiff attempts to avoid arbitration by asserting that the arbitration provision at

11   issue is unconscionable, he bears the burden of putting forth facts showing both procedural and

12   substantive unconscionability.   *Peterson v. Lyft, Inc.*, No. 16-cv-07343-LB, 2018 WL 6047085, at

13   *4 (N.D. Cal. Nov. 19, 2018); *Sanchez v. Valencia Holding Co.*, 61 Cal.4th 899, 910-11 (2015);

14   *see also Aanderud*, 13 Cal. App. 5th at 894.   The party seeking to avoid enforcement of a contract

15   must demonstrate "a substantial degree of unfairness *beyond 'a simple old-fashioned bad*

16   *bargain*.'"   *Sanchez*, 61 Cal. 4th at 911 (emphasis in original).[6]   The Agreements here are neither

17   procedurally nor substantively unconscionable.

18                 Procedural unconscionability arises when there is unequal bargaining power in the making

19   of the agreement.   *Aanderud,* 13 Cal. App. 5th at 895-96.   Courts consider factors including the

20   buyer's sophistication, the use of external pressure to induce acceptance and alternative sources

21   of supply for the goods or services at issue.   *Dean Witter Reynolds, Inc. v. Superior Court*, 211

22   Cal. App. 3d 758, 767–72 (1989).   "[A] finding of procedural unconscionability does not mean

23   that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of

24   the contract to ensure they are not manifestly unfair or one-sided."   *Sanchez*, 61 Cal.4th at 915

25   (quoting *Gentry v. Superior Court*, 42 Cal.4th 443, 470 (2007)).

26

27   ──────────────

     [6] California state law, at least to the extent consistent with the FAA and the United States
28   Supreme Court's decisions, governs whether the arbitration agreement may be revoked on the
     grounds of unconscionability.   *Chin v. Boehringer Ingelham Pharms., Inc.*, No. 17-cv-03703-
     JSC, 2017 WL 3977381, at *4 (N.D. Cal. Sep. 11, 2017).

FENWICK & WEST LLP
ATTORNEYS AT LAW

Here, although the arbitration agreements were adhesive, they were not procedurally unfair. The EULAs and TOS were presented to the putative class members for review multiple times during the checkout, download and/or installation processes. *See, e.g.*, *Crook v. Wyndham Vacation Ownership, Inc.*, No. 13-CV-03669-WHO, 2013 WL 11275036, at *4 (N.D. Cal. Nov. 8, 2013) (finding "plaintiffs' claims of oppression and unfair surprise [were] unpersuasive" where the parties had entered into multiple agreements containing similar dispute resolution clauses). Further, internet users who agree to accept online terms are by now fully aware that these agreements will govern their rights, even if the user may choose not to read the terms each time she accepts them. *See, e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) ("Any reasonably active adult consumer will almost certainly appreciate that by signing up for a particular [online] service, he or she is accepting the terms and conditions of the provider. . . . To be sure, few people may take time to actually read the user agreements. But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up . . . ."); *Sanchez*, 61 Cal.4th at 915 ("[E]ven when a customer is assured it is not necessary to read a standard form contract with an arbitration clause, it is generally unreasonable, in reliance on such assurances, to neglect to read a written contract before signing it.") (internal quotation marks omitted). The users who affirmatively agreed to accept online terms cannot contend they were unfairly oppressed with unknown terms. Further, the FAC acknowledges Plaintiffs had alternatives to purchasing these particular security products, alleging (even if conclusorily) that they would not have purchased these products had they known of the undisclosed vulnerabilities. FAC ¶ 95.

The arbitration agreements are also not substantively unconscionable. Substantive unconscionability arises if there will be "overly harsh" or "one-sided" results of an agreement. *Id.* Symantec's arbitration agreements are neither. They contain a number of provisions designed to make arbitration accessible and fair to purchasers, including that the arbitration takes place in their home jurisdictions, and that Symantec pays an additional $500 or 10% of the amount awarded, whichever is greater, if the arbitrator issues the consumer an award that is greater than the value of Symantec's last written settlement offer. Chiang Decl. Exhs. A-D, F-G, I at § 11, E,

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   H, J-K, M at § 9, L at § 12.B.b, N at § 10.3.2.  There is no allegation or evidence that the

2   arbitration agreements lead to one-sided or harsh results.  Accordingly, the agreements are not

3   unconscionable.

**B.    This Court Should Deny Class Certification as to the Post-Arbitration Purchasers and Strike or Modify the Class Definition to Exclude Them**

**1.    This Court May Deny Class Certification and Strike or Modify the Class Definition**

7    Federal Rule of Civil Procedure 23 requires that a court, "[a]t an early practicable time"

8   determine whether to certify an action as a class action.  Fed. R. Civ. P. 23(c)(A).

9    Under Rule 23(c), "[a] defendant may move to deny class certification before a plaintiff

10   files a motion to certify a class." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 941

11   (9th Cir. 2009).  In *Campanelli*, 2018 WL 6727825 at *5, for example, when defendant filed a

12   motion for summary judgment that non-present signatories to arbitration agreements could not

13   proceed in the putative class action, the Court directed defendants to refile their argument as a

14   motion to deny class certification under *Vinole*, and subsequently granted the motion to deny

15   certification.  *See also Conde v. Open Door Mktg.*, 223 F. Supp. 3d 949, 958-63 (N.D. Cal. 2017)

16   (granting defendant's "preemptive" motion to deny class certification as to the portion of putative

17   class that had signed an arbitration agreement which the named plaintiff had not).

18    To accomplish the reshaping of a class definition that is inappropriately broad, Rule

19   23(d)(1)(D) empowers the court to order that "pleadings be amended to eliminate allegations

20   about representation of absent persons and that the action proceed accordingly."  *See, e.g.*, *Avilez*

21   *v. Pinkerton Gov't Servs., Inc.*, 596 Fed. Appx. 579, 580 (9th Cir. 2015) (excluding signatories to

22   class action waiver from class and directing district court, on remand, to consider affirmative

23   defenses applicable to putative class members and "cull the class accordingly"); *Sutcliffe v. Wells*

24   *Fargo Bank, N.A.*, No. C-11-06595 JCS, 2012 WL 4835325, at *2 (N.D. Cal. Oct. 9, 2012);

25   *Santangelo v. Comcast Corp.*, No. 15-CV-0293, 2017 WL 6039903, at *3 (N.D. Ill. Dec. 6,

26   2017).

27    In this action, the Court may and should deny certification as to the Post-Arbitration

28   Purchasers, who cannot participate here, and modify the class definition accordingly.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

2

**2.     The Court Should Deny Class Certification, and the Putative Class Definition Should be Stricken or Modified, Because it Includes Individuals that Cannot Participate in this Action**

3      As established above, a significant portion of the putative class members, numbering well

4   into the tens of millions, entered agreements to arbitrate their claims with Symantec on an

5   individual basis.  Those putative class members cannot participate in this action.  *See, e.g.*, *Woods*

6   *v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 5188682, at *16 (N.D. Cal. Sept. 4, 2015)

7   (Chen, J.) (modifying the class definition to exclude putative class members who signed

8   arbitration agreements); *King v. Capital One Bank (USA), N.A.*, No. 3:11-cv-00068, 2012 WL

9   5570624, at *14 (W.D. Va. Nov. 15, 2012) (finding that the named plaintiff not subject to

10   arbitration agreement "could not fairly and adequately represent in this Court the interests of

11   individuals who are bound to pursue their claims in arbitration" and "[m]ore fundamentally, [that]

12   allowing Plaintiff to represent individuals bound to pursue their claims in arbitration would render

13   the arbitration clauses totally useless, in contravention of the FAA").

14      The Court should deny class certification to the extent that the class encompasses the

15   Post-Arbitration Purchasers, and order that group excluded from a modified class definition.

16

17

**C.     Symantec's Arbitration Agreements Destroy Typicality and Render Plaintiffs Inadequate Class Representatives**

18      Whether on a motion to certify or to deny certification, "[t]he party seeking class

19   certification bears the burden of demonstrating by a preponderance of the evidence that all four

20   requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met."

21   *Campanelli*, 2018 WL 6727825, at *7 (addressing a defendant's motion to deny certification,

22   citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51(2011).  Because Plaintiffs allege that

23   their claims are not subject to Symantec's arbitration agreements, they cannot demonstrate

24   typicality and adequacy required by Rules 23(a)(3) and (4).

25      To justify a departure from the "usual rule that litigation is conducted by and on behalf of

26   the individual named parties only," *Dukes*, 564 U.S. at 349, a plaintiff must show, among other

27   things, that the "claims or defenses of the representative parties are typical of the claims or

28   defenses of the class" and "the representative parties will fairly and adequately protect the

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  interests of the class." Fed. R. Civ. P. 23(a)(3)–(4).  A class representative's claims and defenses

2  are typical only if they are "reasonably coextensive" with those of the class members they seek to

3  represent, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), and the representative

4  party must "'possess the same interest and suffer the same injury' as the class members.  *Dukes*,

5  564 U.S. at 348-49.  To be "adequate" for purposes of Rule 23(a)(4), a class representative (1)

6  must not have any conflicts of interest with the proposed class; and (2) must prosecute the action

7  vigorously on behalf of the class.  *Hanlon*, 150 F.3d at 1020.  "Adequate representation depends

8  on, among other factors, . . . a sharing of interest between representatives and absentees."  *Ellis v.*

9  *Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).  A plaintiff who does not have

10 standing or interest in asserting critical arguments required for absent class members is not an

11 adequate representative.  *See, e.g.*, *Avilez*, 596 Fed. Appx. at 579.  Here, the Plaintiffs cannot

12 satisfy the typicality and adequacy requirements for, at least, the Post-Arbitration Purchasers.[7]

13     In *Avilez*, 596 Fed. Appx. at 579, the Ninth Circuit held that Rule 23(a)'s typicality and

14 adequacy requirements are not satisfied when a named plaintiff who is not subject to an

15 arbitration agreement with class action waivers seeks to represent putative class members who are

16 parties to such waiver agreements.  There, the named plaintiff signed an arbitration agreement

17 that did not contain a class action waiver, yet some members of the class she sought to represent

18 accepted agreements containing class action waivers.  *Id.*  The district court certified the class,

19 and the Ninth Circuit reversed:

20    The district court abused its discretion to the extent it certified classes and subclasses
      that include employees who signed class action waivers. Avilez's arbitration
21    agreement does not contain a class action waiver and counsel did not dispute that
      those who signed such waivers have potential defenses that Avilez would be unable
22    to argue on their behalf. To the extent the classes and subclasses include individuals
      who signed class action waivers, Avilez is not an adequate representative,
23    Fed.R.Civ.P. 23(a)(4), and her claim lacks typicality, Fed.R.Civ.P. 23(a)(3).

24 *Id.*

25     Applying this reasoning, district courts throughout this District and elsewhere regularly

26 deny class treatment for lack of adequacy and typicality where, as here, putative class members

27 ―――――――――――――――――
   [7] Symantec addresses here the narrow context of application of the arbitration agreements to
28 certain putative class members.  Symantec reserves the right to oppose class certification and the
   class definition based on numerous other arguments in due course.

entered arbitration agreements or class action waivers that the named plaintiffs had not.  For

instance, in *Conde*, relying on *Azila*, this district found that "Plaintiffs cannot satisfy Rule 23's

typicality prerequisite as to a class that includes individuals who signed the [arbitration

agreement] and are therefore possibly bound by an arbitration agreement.  The Court therefore

GRANTS [defendant's] motion to deny class certification as to these individuals."  223 F. Supp.

3d at 963.  As the *Conde* court explained:

> Plaintiffs are not personally affected by the arbitration agreements at issue because
> they have not signed agreements that contain similar terms; [the defendant] cannot
> require Plaintiffs to arbitrate because Plaintiffs are not bound by any such
> agreement.  Plaintiffs therefore have no interest in the enforceability of the
> arbitration agreement itself, and lack the ability to challenge the agreements on
> behalf of individuals who did sign such agreements.  Thus, the defenses the named
> Plaintiffs are subject to are not typical of the class as proposed.

*Id.* at 960.  Similarly, in *Campanelli*, Chief Judge Hamilton denied class certification because

"Campanelli is neither subject to an arbitration clause nor a class/collective action waiver.  Thus,

he is not an adequate representative and his claims lack typicality with respect to putative Rule 23

plaintiffs who have signed [such agreements]."  2018 WL 6727825, at *7.

Numerous other district courts have reached similar conclusions.  *See, e.g.*, *Tan v.

Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439, at *3, 6 (N.D. Cal. July 19, 2016)

(finding that named plaintiffs lacked standing to challenge arbitration provisions they did not

subscribe to and failed to satisfy the typicality and adequacy requirements where they were not

subject to the same arbitration provisions as most of the putative class members); *Tschudy v. JC

Penney Corp.*, No. 11CV01011-JM(KSC), 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015)

(holding that named plaintiffs not bound by the same arbitration agreements as putative class

members "fail[ed] to satisfy the typicality and adequacy requirements of [Rule 23]"); *King*, 2012

WL 5570624, at *14; *Renton v. Kaiser Found. Health Plan, Inc.*, No. C00-5370RJB, 2001 WL

1218773, at *7 (W.D. Wash. Sept. 24, 2001) (finding no typicality where "[u]nlike many class

members, [plaintiff] was not subject to an arbitration agreement under her plan"); *Quinlan v.

Macy's Corporate Servs.*, No. 12-00737, 2013 WL 11091572 *3 (C.D. Cal. Aug. 22, 2013)

(declining to certify a class because the plaintiff was not subject to an arbitration agreement,

FENWICK & WEST LLP
ATTORNEYS AT LAW

whereas most of the purported class members were).

Here, Plaintiffs stand in a different position than the tens of millions of Post-Arbitration Purchasers—all of whom face the dispositive defense that they are subject to arbitration. Plaintiffs who did not have arbitration agreements have no legal interest in the application of the arbitration provisions, and no standing even to challenge their enforceability. *Tan*, 2016 WL 4721439, at *6 (citing cases); *Conde*, 223 F. Supp. 3d at 959-61 (N.D. Cal. 2017); *Campanelli*, 2018 WL 6727825, at *7-8; *Avilez*, 596 F. App'x at 579. The Post-Arbitration Purchasers will face "potential defenses [to enforcement of their arbitration agreements] that [Plaintiffs] would be unable to argue on their behalf." *Id.*

Furthermore, because the named Plaintiffs are not adequate representatives to litigate defenses that belong only to absent class members, class certification must be denied regardless of any potential arguments over the arbitration agreements' enforceability. As the *Conde*, *Campanelli*, and *Tan* courts all found, "it was enough that the named plaintiff had not signed a class action waiver and the putative class members he sought to represent had signed such an agreement. . . . without delving into the enforceability of arbitration agreements that the named plaintiff is not a party to." *Campanelli*, 2018 WL 6727825, at *7-8; *Tan*, 2016 WL 4721439 at *6 ("[T]he Court declines to reach these arguments [about enforceability] because Lawson has no standing to challenge the applicability or enforceability of the arbitration and class action waiver provisions. . . . [that] do not apply to him."); *Conde*, 223 F. Supp. 3d at 960. Accordingly, while the arbitration agreements here are enforceable, the Court need not reach or take discovery on that issue to determine that the named Plaintiffs Beyer and Cheslow cannot represent the Post-Arbitration Purchasers.

In sum, the divergence in the situations of Plaintiffs and the Post-Arbitration Purchasers destroys typicality and renders Plaintiffs inadequate representatives. Therefore, class certification should be denied as to the Post-Arbitration Purchasers, and the class definition should be modified to exclude them.

Entry of such an order now is both legally correct and in the interest of justice. This case involves a potentially massive class. If it proceeds past the pending Motion to Dismiss the FAC,

FENWICK & WEST LLP
ATTORNEYS AT LAW

it seeks to encompass eleven years of Symantec software, scores of different versions of different Norton products, and millions upon millions of customers.  Four years' worth of those customers and dozens of versions of software are subject to arbitration agreements.  Limiting discovery and other motion practice to the customers not subject to arbitration will conform with Fed. R. Civ. P. 1 and further the "just, speedy, and inexpensive" resolution of this action.  *See, e.g.*, *Campanelli*, 2018 WL 6727825, at *8 (rejecting request to delay ruling denying class certification: "The court will delay its ruling only if it finds that discovery would be useful or is necessary in making that determination.").

**D.    Class Certification Should be Denied Even if A Named Plaintiff Were Subject to the Arbitration Agreements**

Finally, even if, contrary to the allegations of the FAC, either named Plaintiff were subject to arbitration agreements with Symantec, class certification should still be denied as to the Post-Arbitration Purchasers.  To the extent that a named Plaintiff could even theoretically prove to be a typical or adequate class representative for the Post-Arbitration Purchasers, then the Court must adjudge that the arbitration agreements preclude participation by the Post-Arbitration Purchasers in this action, or at a minimum require them to arbitrate arbitrability.  In all events, they cannot be part of this class action, and the Court should so order.

**V.    CONCLUSION**

For the foregoing reasons, Symantec respectfully requests that the Court deny class certification to the extent it would include the Post-Arbitration Purchasers and modify the class definition in the FAC to exclude those individuals subject to an arbitration provision requiring them to arbitrate any disputes with Symantec on an individual basis.

Dated:   January 17, 2019            FENWICK & WEST LLP


By: */s/ Laurence F. Pulgram*
    Laurence F. Pulgram

Attorneys for Defendant Symantec Corporation

FENWICK & WEST LLP
ATTORNEYS AT LAW